STATE OF NORTH CAROLINA v. WILLIAM CARROLL DAVIS AND
JAMES WALLACE HONEYCUTT
— AND —
STATE OF NORTH CAROLINA v. MACK FISH

No. 40 and No. 41

(Filed 25 February 1974)

**1. Criminal Law § 162— necessity for objection to evidence and motion to strike**

Defendant was not prejudiced by testimony that during the trial he waved a piece of paper at the witness on which was written, "Don't

worry; Jesus will save me," and by testimony that he showed another witness a piece of paper which said, "Don't worry; Jesus will save you," since defendant made no objection to the questions which elicited that testimony and no motion to strike the answers.

**2. Criminal Law §§ 23, 74— letter as confession or tendered guilty plea**

A letter written by defendant and sent to the superior court judge while defendant was in jail awaiting trial which contained the words " . . . I'm guilty of my charge of murder . . . . Judge, here is my confession in writing," if genuine, was a confession and not a tendered plea of guilty.

**3. Criminal Law § 76— voluntariness of confession — specific findings not made on voir dire — harmless error**

Where defendant wrote a letter containing his confession and had it delivered to the superior court judge but at trial contended that the letter was not written with understanding, the trial court's ruling that the letter was admissible of necessity was based on the court's conclusion that defendant wrote it voluntarily and with understanding, and error of the trial court in failing to make specific findings was harmless beyond a reasonable doubt.

**4. Criminal Law §§ 76, 81— transcript of confession — best evidence rule**

Though a tape recording was made of defendant's statement given to police officers in the presence of his codefendants, the best evidence rule did not preclude one of the officers from reading at trial from a transcript which, according to his sworn testimony, recorded the exact words used by the accused in his presence.

**5. Criminal Law §§ 162, 163— insufficiency of assignments of error to exclusion of evidence, charge**

Defendant's assignments of error to the trial court's exclusion of evidence concerning his medical history and mental capacity and to the trial court's charge did not comply with Rule 19(3) of the Rules of Practice in the Supreme Court since they did not set out the questions to which objections were sustained and the answers which the witnesses would have given had they been permitted to answer or the portion of the charge which was objectionable.

**6. Homicide § 21— murder of store owner — sufficiency of evidence**

In a prosecution for murder, evidence was sufficient to withstand defendants' motions for nonsuit where it tended to show that defendants conspired to rob the victim at his store; defendants stole a car for use in the robbery; while one defendant waited in a truck in a wooded area nearby, two defendants drove the car to the victim's store; in the robbery attempt one defendant shot and killed the victim; immediately thereafter, the two defendants drove the car to the waiting truck and the third defendant; there they abandoned the car and drove the truck to one defendant's home in Raleigh where one defendant passed out after smoking some dope; and later that same afternoon, the two other defendants left Raleigh and were apprehended eleven days later in Texas.

7. **Criminal Law §§ 76, 95— consolidated trials — admissibility of confession**

  In a consolidated trial all portions of an extrajudicial confession or incriminating statement by one defendant which implicate a codefendant are inadmissible unless (1) special circumstances render the statement also admissible against the codefendant, or (2) the defendant making the statement takes the stand so that he may be cross-examined.

8. **Constitutional Law § 31; Criminal Law §§ 95, 169— consolidated trials — admission of statements and confessions harmless error**

  In the consolidated trial of three defendants where none of the defendants testified, the trial court erred in allowing into evidence statements by third persons and by defendants, though the court instructed the jury to consider certain of the statements only against certain of the defendants, since the admission of the statements denied defendants their constitutional right of confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments; however, competent evidence against defendants so positively established their guilty participation in the victim's murder that the incompetent evidence, even in its totality, was harmless beyond a reasonable doubt.

9. **Criminal Law § 76— admissibility of defendant's statement — finding of voluntariness**

  Statement made by one defendant to officers that statements of his two codefendants made to officers on the same day were true was properly admitted into evidence where the trial court conducted a *voir dire* and found that the three statements involved were made freely, understandingly, and voluntarily.

APPEAL by defendants under G.S. 7A-27 (a) from *Braswell, J.,* 9 April 1973 Session of WAKE, docketed and argued as cases Nos. 59 and 60 at the Fall Term 1973.

Defendants were jointly tried upon separate bills of indictments, couched in the words of G.S. 15-144 and returned at the 2 November 1972 Session, in which each was charged with the murder of Albert Eugene Bunn on 29 August 1972. Upon affidavits of indigency the Court appointed counsel for defendant Honeycutt on 6 September 1972 and for defendants Davis and Fish on 12 September 1972. Thereafter, upon the affidavit of his counsel, each defendant was committed to Dorothea Dix State Hospital at Raleigh pursuant to G.S. 122-91. Each defendant was examined there and found to be "without psychosis [not insane]." In due course each was returned to the Superior Court of Wake County as competent to stand trial and to assist effectively in his defense.

When the three cases were called for trial on 9 April 1973 Davis and Honeycutt each moved for a trial separate from the

other two defendants. The solicitor moved to consolidate the three cases for trial. Over the objection of each defendant the court allowed the motion to consolidate, and Davis and Honeycutt excepted. After being individually arraigned, each defendant entered a plea of not guilty.

The evidence for the State tended to show:

At the time of his death Albert Eugene Bunn was 71 years old. He operated a small country store at the intersection of the Old Smithfield Road and Schoolhouse Road in the vicinity of Knightdale in Wake County. Schoolhouse Road runs from Old Smithfield Road to another road which goes past Knightdale School and on back into Old Smithfield Road. These three connecting roads form a three-mile circle around Bunn's store. About one mile from the store on Schoolhouse Road a dirt lane leads into a heavily wooded parking area.

About 1:00 p.m. on 29 August 1972 Ricky Pope, a teenage boy, parked his tractor across Schoolhouse Road from the front of Bunn's store to wait for his friend, Tim Holmquist, who was driving another tractor behind him. Ricky's plan was to buy a drink at the store. However, a burgundy Dodge automobile, which had just passed him "going pretty fast," backed into the store yard. As Ricky watched, Fish and Davis alighted from the vehicle and Fish, the driver, with a sawed-off shotgun in his hand, forced Mr. Bunn inside the store. As they entered the door the three men passed from Ricky's view. He heard a shot and seconds thereafter Fish and Davis ran out of the store. Ricky "took off" toward his home. The burgundy Dodge passed him again, and when he "got around the curve" he saw a white truck come out of the woods. He went home and got his father. Defendant Honeycutt was not with Davis and Fish in the burgundy Dodge or at Bunn's store.

After the sheriff came, Ricky went down the path on which the white truck emerged from the woods. The burgundy Dodge which he had seen earlier was parked down the path.

In response to a telephone call Deputy Sheriffs Covert and Chalk went to Bunn's store about 1:30 p.m. on 29 August 1972. They found Bunn's body lying face down across the threshold. Bunn was dead from a gunshot wound in the left chest. Under the left side of his body was a paring knife. His .22 revolver, fully loaded with unexpended bullets, was at his right side. A trail of blood led from a store counter to the body.

Sometime after 11:55 a.m. on 29 August 1972 Mr. V. E. Wilkins' burgundy Dodge automobile was stolen from a parking lot in Clayton. On 31 August 1972 Honeycutt's truck was found parked 300-500 yards from the place where the Dodge was stolen. (The presence of this evidence suggests that it was Wilkins' burgundy Dodge which Fish drove to Bunn's store, but there is no evidence to substantiate this.)

On the Sunday evening prior to Mr. Bunn's death, 27 August 1972, Honeycutt was at the home of Fish on Gavin Street in Raleigh. Debra Garland Nipper, who "was sleeping with Fish at the time," was also there. She testified that she heard Fish and Honeycutt talking about a filling station. Honeycutt told Fish that the man who ran the store always had a lot of money but he had a gun which he kept in a cigar box all the time; that he was an old man, not too smart, and it shouldn't be hard to rob him. This testimony was admitted over Davis' objection. The court restricted it to Fish and Honeycutt and denied Davis' motion to strike.

About 2:00 p.m. on Tuesday, 29 August 1972, Fish (aged 24), Davis (17), and Honeycutt (26) were at Fish's residence. Linda Faye Ashworth was also there. Fish, who had blood on his T-shirt, told Linda there had been some trouble about which he couldn't tell her. He sent her and Honeycutt to a laundromat to get Kim Zachary Wall and Debra Garland Nipper. When those three returned Fish had changed clothes and shaved off his goatee and mustache. Wall testified that at first he did not recognize Fish.

Over the objection of Davis and Honeycutt, Wall testified that Fish told him "they had went and the man had pulled a gun on them and it was either one of them getting shot. . . . [H]e said he had to shoot him." Debra Garland Nipper testified that she also heard Fish tell Wall "that he had to do a man a job"; that the man had pulled a gun on him and it was his life or the other man's life. Davis and Honeycutt were not present during this conversation. Each objected to the foregoing testimony, which the court admitted only as to Fish.

After the conversation about the shooting Fish asked Wall to walk around the house with him. He did so, and Fish hid his gun, State's Exhibit #1, while Wall watched. Two days thereafter, on 31 August 1972, Deputy Sheriff Anthony went to Fish's home and talked to Kim Wall. Wall led Anthony to a pile

of creosoted timbers on adjoining property about 21 yards back of the residence. Under these timbers the officer found the gun (State's Exhibit #1).

On 9 September 1972 Covert and another deputy sheriff returned Fish and Davis to Wake County from Hondo, Texas, about 90 miles from the Mexican border, where they were in the county jail. During the trip back from Texas the officers did not question either of the two men. In order to give both officers and defendants time to "rest up" questioning was delayed for two days. Meanwhile Fish and Davis were placed in the Wake County jail.

On 11 September 1972, about 9:35 a.m., Deputy Sheriff Munn, in the presence of Covert, fully advised Davis of his constitutional rights as required by the *Miranda* decision, and Davis read a statement of them. Thereafter, in the interrogation room of the Wake County Sheriff's Department, Davis signed the following waiver of his constitutional rights:

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone."

After signing the above waiver in the presence of Munn and Covert, Davis stated that on August 29th he and two unnamed friends "went to Clayton and got a car," stopped at Mr. Bunn's store and while he and his friends were there Bunn "was shot and killed." They then "got rid of the car and went on and left." After making this statement Davis told the officer that if they would get Fish and Honeycutt and let the three of them converse with each other, they would get their statements straightened out. Accordingly, about 10:35 a.m., the officers brought Fish and Honeycutt down from the jail. Each was given the *Miranda* warning and each thereafter signed the same waiver of rights which Davis had signed. Fish, Honeycutt, and Davis were then left alone in the interrogation room, where nothing they said to each other could be overheard.

After 15-20 minutes the defendants knocked on the door and Deputies Munn, Covert, and Anthony went in. In the presence of defendants Fish and Honeycutt, Davis made the following statement:

"This statement made by William Carroll Davis at the Wake County Sheriff's Department, at 11:00 a.m. in the presence of Wallace Honeycutt, Mack Fish, Deputy Sheriff Anthony, Deputy Sheriff Covert, Deputy Sheriff M. T. Munn. This statement is being made on September 11, 1972. On August 29 at approximately 12:30 I was picked up by Mack Fish and Wallace Honeycutt at a friend's house. We left and went and got something to drink and messed around for a while and then went to Clayton and got a car, then rode to Mr. Bunn's store. We drove past it once and the second time Mack and I stopped and asked the man for some beer. We got outside of the car and I stood outside and Mack and Mr. Bunn—Mr. Bunn went in first and Mack followed in behind him and Mack had his back turned to me and I just glanced over there and when I glanced over there, I heard a gun go off and I seen Mr. Bunn fall to the ground and we left and I went and ditched the car in the woods and rode back to Raleigh with Wallace Honeycutt and then we left."

On the same occasion, in the presence of the three officers, Davis and Honeycutt, Fish made a statement which, in pertinent part, is set out below:

"This statement is being made by Mack Fish at the Wake County Sheriff's office on September 11, 1972, at 11:11 a.m. in the presence of Wallace Honeycutt, William Carroll Davis, J. W. Anthony, Deputy Sheriff, L. S. Covert, Deputy Sheriff, and M. T. Munn, Deputy Sheriff. I was driving the car and I pulled up and I remember two people sitting on the outside, and I asked the man out of the car window—I said, 'Do you sell beer here?' and he said, 'Yea.' And I remember telling him that I wanted all his beer. And I was going to ask him for his money— I must have had—but anyway I got out of the car. And it was an old man and he was peeling potatoes and he had a knife. And he walked into the store, and he was near about running. . . . I remember I had to speed up to catch up with him. And he went to the back and when he turned around he had a gun. . . . I said 'Put that gun down.' And he pointed the gun at me and I just shot. And the man fell on top of me and I like not to got out under him. . . . and when I got to the end of the door, he fell and we just turned around and I believe I told Billy, 'Let's go.' And he jumped in the car because he was on the outside and I got in and I drove away. . . . I went on down. . . and there was a dirt path on the other side of the bridge and I turned down there. And the best I remember—like Wallace, he was

pretty drunk and I told him, I said, 'Man I can drive a lot better than you anyway.' And so I got in the car, made him get in the truck or something—anyway I ended up driving. And so we left. . . . I ended up home and then I pulled out some dope and I rolled up some joints, and we all smoked some dope and Wallace [Honeycutt] passed out on the bed and I remember going and changing clothes there in my back room and hiding my gun and clothes behind the house. . . . [T]hen I went on in and smoked some more grass. . . . And then later on I think Billy woke me up and said something about the cops are looking for us or something like that and I said, 'Well, let's go.' And so we took off hitchhiking. So after we left Raleigh hitchhiking we hitchhiked on down to Columbia, South Carolina . . . and I bought us two tickets for Atlanta, Georgia. And so we caught the bus from Columbia, Alabama to Atlanta, Georgia—Columbia, South Carolina to Atlanta, Georgia. Okay. And then we hitchhiked on down to Birmingham. . . . I bought a little grass at Birmingham and I sat down and smoked half of that and went to the truck stop and bought some beer and drunk that. And I woke up then and Billy . . . wanted to spend the night in a motel . . . and we spent the night there and the next day I went on in and drunk some more beer and we hitchhiked on out to Texas and that's where I remember a guy letting us off and as soon as he let us off, a policeman picked us up.".

The Davis statement, over their objections, was admitted as to the three defendants. Davis and Honeycutt excepted. Over objection, the Fish statement was likewise admitted as to all defendants. Davis and Honeycutt again excepted.

After Davis and Fish had made the statements set out above, Deputy Munn asked Honeycutt if the statements were true and he said, "Yes, they are." Honeycutt had been present the entire time and knew the statements were being taped. The court overruled objections by defendants Davis and Honeycutt to Honeycutt's statement and also their motion to strike it from the evidence.

Before admitting the statements of Davis, Fish, and Honeycutt set out above Judge Braswell conducted a *voir dire* to determine their competency. At this inquiry Officer Munn testified that the statements of Davis and Fish were verbatim transcripts of their words as recorded at the time they were spoken; that the tapes were available; that defendants were promised no reward or assistance for making a statement; that they were not threat-

State v. Davis and State v. Fish

ened, mistreated, abused or denied any necessities or conveniences.

Defendant Davis, offering evidence "for the purpose of voir dire only," testified that "before or after he signed the waiver"—he was not sure which—Covert told him that if the judge asked whether he cooperated he would tell the judge how it was; that aside from that statement by Covert no person made any promises or threats to encourage him to sign a waiver or make a statement.

Fish testified that at the time he made his statement he was so sick he didn't know what to say and "they" would tell him what to say; that Mr. Munn told him they had his bloody clothes and gun; so he said whatever they wanted him to say; that he "was like a small child"; that he had been on drugs until he was put in jail in Wake County but for a week prior to the interrogation he had had none; that during the week he had had no conversation with anyone he knew.

Fish's sister testified that when she saw him, a week after he was brought back from Texas, she noticed a "definite change" in his behavoir and general physical condition. His mother testified that when she saw him (she did not recall the day) "he was in terrible physical condition and refused to talk to her."

Honeycutt testified that at the end of the statements made by Davis and Fish, Mr. Munn asked him if he wanted to change anything and he said, "No sir"; that he did not think he was asked if the statements were true.

At the conclusion of the voir dire Judge Braswell found that Officer Munn advised Davis of all his constitutional rights prior to the time Davis signed the waiver; that both of his statements were free and voluntarily made thereafter and were obtained without a violation of any constitutional right. The court specifically found that, after observing the demeanor of Davis during the time he was testifying, he could put no credence in his testimony that his statement was induced by the hope of reward; that there is no believable evidence to support a finding that any person held out any hope of leniency to Davis.

As to defendants Fish and Honeycutt, Judge Braswell found that they too had each been fully warned of all constitutional rights prior to signing the waiver; that each had voluntarily, knowingly, and with full understanding of his constitutional

right to remain silent, had made the statements offered in evidence; that no threats, promises, or hope of reward was held out to either; that the three defendants had an opportunity to see, hear, converse with and contradict each other; and that no contradictions were made.

On 7 November 1972 one of the jailers informed Deputy Sheriff Covert that Fish wanted to see him. When Covert went to his cell in the Wake County jail, Fish handed him a letter through the bars and asked him to take it to the judge of the superior court. Covert delivered the letter to Judge Harry E. Canaday, who ordered it made a part of the court records. The letter, reproduced below, was admitted in evidence over the objections of Fish and Davis against Fish only:

"November 7, 1972

"Dear Sir:

"Judge, Your Honor, my name is Mack Fish and I'm writing you in concern of my case. Your Honor, I have been in jail for over two months and I hadn't received a hearing yet. Your Honor, I'm guilty of my charge of murder. I don't know how to began to ask for mercy, so I'm asking now. Judge, God has dealt in life as the most powerful thing that ever entered into my life. Judge, here is my confession in writing and I am asking you if you would set me a bond so I might be with my family before I get tried. Judge, Your Honor, my mother has cancer since I have been in here and it has broken my heart. I know that God made the law to live by and as the Bible said. I have a fiancee and two children who I would like to spend a few days with before I'm tried. I know I don't deserve anything, but your Honor, I'm begging, not asking. Please talk to me and ask God for guiding in my case. Thank you for reading this. Yours sincerely, Rev. Mack Fish. And this is true from my heart. God bless."

Prior to the introduction of the letter, at the request of Fish, Judge Braswell conducted a *voir dire*. On this hearing Covert detailed the circumstances under which he received the letter as set out above. Fish testified that he wrote the letter, which he handed to Covert in a sealed envelope on 7 November 1972; that he told Covert it was a confession and asked him to deliver it to the judge. He also testified that at the time he wrote the letter he was insane, "just as crazy as a man could

be part of the time . . . having drawbacks from drugs." He said, "I had a lot of other stuff on my mind. I was entangled." In explanation of his signature to the letter he said that he "was licensed as a minister by the Full Gospel Fellowship in 1971." Fish's sister and Jailer Hodge testified that in October and November 1972 Fish would not communicate, "did gross things," seemed irresponsive and "not right in his mind." Jailer Bagwell testified he "noticed that Fish had no trouble communicating with people."

At the conclusion of the *voir dire,* in the absence of the jury, Judge Braswell found that Fish wrote the letter and delivered it to Covert as both had testified he did and he ruled that the letter was competent evidence; that the statement, "I am guilty of my charge of murder," is sufficient to constitute a confession, but that the weight and credence to be accorded the contents of the letter was a matter for the jury.

At the conclusion of the State's evidence Fish offered the testimony of his mother and Dr. John A. Gallemore, Jr., an assistant professor of psychiatry at Duke University. Their evidence tended to show:

Fish lived in his mother's home until three weeks before Mr. Bunn was killed. During those three weeks she saw him every three to four days and noticed a change in his behavior. He was unable to hang wallpaper straight and complained of headaches. In her opinion, "before the alleged crime" and after he was incarcerated in the Wake County jail, Fish could not distinguish right from wrong.

Dr. Gallemore examined Fish on October 13th and 15th in the Wake County jail. Each examination lasted about thirty minutes. At that time he found Fish "intact mentally in terms of his clarity, of his comments and his relating. . . . His comments were heavily involved with supernatural. At times there was a bit of intense anger and effects demonstrated." At that time he was not able to reach any diagnosis of Fish's mental condition. In December, after Fish's admission to the State Hospital, Dr. Gallemore examined him again. Fish gave a lengthy history of drug use and Dr. Gallemore "obtained a history of violence of Mack Fish after he had been on amphetamines. In 1970 he was taking amphetamines in heavy amounts when he shot himself." On 8 December 1972, Dr. Gallemore's diagnosis was "personality disorder of the emotional unstabled type." He

had no opinion satisfactory to himself whether Mack Fish knew the nature and consequences of his action or knew right from wrong at the time of the crime charged, *i.e.*, 29 August 1972. However, in his opinion, on December 8th, Fish did know right from wrong and the nature and consequences of his actions. It was also his opinion that Fish's condition was unchanged since August 29th.

Defendant Davis offered evidence tending to show that at the time of the trial he was seventeen years of age and that his general character and reputation were good.

Defendant Honeycutt offered no evidence. None of the three defendants testified.

The court charged the jury that as to each defendant it would return a verdict of "guilty of murder in the first degree as charged or not guilty." The jury found each defendant guilty of the murder charged and the court adjudged that each be imprisoned for life in the State's prison. Each defendant appealed to the Supreme Court. Davis and Honeycutt appealed jointly. Fish filed a separate appeal.

*Robert Morgan, Attorney General, John R. B. Matthis, Assistant Attorney General, Ralf F. Haskell, Assistant Attorney General, for the State.*

*William A. Smith, Jr., for Mack Fish, defendant appellant.*

*Robert Morgan, Attorney General, Ralph Moody, Special Counsel, for the State.*

*James R. Fullwood for William Carroll Davis, defendant appellant.*

*William E. Marshall, Jr., for James Wallace Honeycutt, defendant appellant.*

SHARP, Justice.

### APPEAL OF DEFENDANT FISH

[1] Fish's first assignment of error is based upon the admission of evidence of the following incidents:

Kim Zachary Wall testified that during the trial Fish waved a piece of paper at him in the courtroom on which was written, "Don't worry; Jesus will save me." Debra Nipper testified that

on the same morning Fish showed· her a piece of paper which said, "Don't worry, Jesus will save you."

The record shows no objection to the questions which elicited the foregoing testimony and no motion to strike the answers. An objection to the admission of evidence must be made at the time it is offered. Objection to incompetent evidence should be interposed at the time the question intended to elicit it is asked, and a motion to strike an incompetent answer should be made when the answer is given. An objection not made in apt time is waived. *Reeves v. Hill,* 272 N.C. 352, 158 S.E. 2d 529 (1968) ; *State v. Hunt,* 223 N.C. 173, 25 S.E. 2d 598 (1943). However, if we concede, as both the State and Fish contend, that the notes were irrelevant, Fish's contention that they inevitably prejudiced him in the eyes of the jury is not convincing. The obvious purpose of the notes was to comfort and reassure his friends. Such a motive was not reprehensible; nor was defendant's first reference to religion and the deity contained in these notes.

In his first assignment defendant has not shown prejudicial error. *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364 (1963).

[2]   Defendant's second assignment of error is that the court erred in holding that his letter to the superior court judge "was a confession rather than a statement of how the defendant intended to plead." Defendant's contention seems to be that the letter was in the nature of a tendered plea of guilty which could be withdrawn at any time before acceptance; that his plea of not guilty withdrew the tendered plea and thereby rendered the letter inadmissible in evidence. This contention is untenable.

In the letter defendant wrote these words: "Your Honor, I'm guilty of my charge of murder. . . . Judge, here is *my confession* in writing." (Italics ours.) A plea of guilty is "a formal confession of guilt before the court in which defendant is arraigned." 2 Strong's N. C. Index 2d *Criminal Law* § 23 (1967). The letter was not such a plea. However, if genuine it qualified as the confession which defendant himself denominated it. *See State v. Hamer,* 240 N.C. 85, 81 S.E. 2d 193 (1954). If voluntarily and understandingly written it was admissible in evidence.

On *voir dire* defendant testified that he wrote the letter, "told Mr. Covert that the letter was a confession and to carry it to the judge." He makes no contention that the letter was in

any manner coerced. However, at the trial he attempted to expunge the letter by saying, "I was having drawbacks from drugs. . . . I was insane when I wrote the letter. . . . I had a lot of other stuff on my mind. I was entangled."

[3] Defendant now contends that the failure of the judge, after conducting the *voir dire,* to make a specific finding that Fish wrote the letter "with understanding" rendered its admission error. The State contends that the evidence which defendant offered to establish a lack of understanding on 7 November 1972 was insufficient to raise the issue.

The mental capacity of a defendant is, of course, a circumstance to be considered in passing upon whether a confession was voluntarily and understandingly made. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). After conducting the *voir dire,* as he was required to do by the objection to the admission of the letter, the judge should have made a finding on the only question defendant disputed. *State v. Vickers,* 274 N.C. 311, 163 S.E. 2d 481 (1968) ; *State v. Barber,* 268 N.C. 509, 151 S.E. 2d 51 (1966). Obviously, however, the ruling that the letter was admissible of necessity was based on the court's conclusion that Fish wrote it voluntarily and with understanding. *State v. Painter,* 265 N.C. 277, 144 S.E. 2d 6 (1965) ; *State v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84 (1947). Indeed, defendant's own testimony on *voir dire* would make any other conclusion irrational. Fish remembered writing the letter, signing it "Reverend Mack Fish," sealing it, and delivering it to Mr. Covert. He also remembered telling him that it was a confession and to carry it to the judge. The contents of the letter itself establish the understanding of its author.

Upon the *voir dire* to determine the admissibility of the statements which Fish made to the investigating officers on 11 September 1972, approximately two months before he wrote the letter on 7 November 1972, Fish and his sister, Mrs. Nichols, gave substantially the same testimony with reference to his mental condition which they gave on *voir dire* to determine the admissibility of the letter. In addition, Mrs. Leona Fish, defendant's mother, testified that his behavior was not normal. At the conclusion of the *voir dire* to determine the admissibility of defendant's oral confession, Judge Braswell specifically found (1) that there was no believable evidence that Fish lacked understanding of what he was doing at the time he made his

statement to the officers on September 11th; and (2) that he made these statements voluntarily and understandingly. These findings are supported by ample evidence and are binding upon this court.

If defendant knew what he was saying on September 11th, the presumption is that he also knew on November 7th. At that time he had been in jail for two months, and the record contains no suggestion that he had had access to drugs there. Furthermore, the statement of September 11th which contains details omitted in the letter fully substantiated Fish's admission therein that he was guilty of the murder with which he was charged.

The trial judge's inadvertent omission to make a finding that Fish wrote the letter voluntarily and with understanding was error. Even so, in the factual setting of this case, the omission was harmless error. As we said in *State v. Frank,* 284 N.C. 137, 145, 200 S.E. 2d 169 (1973), his failure to find the facts upon which his conclusion was based, as he should have done, was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824, 24 A.L.R. 3d 1065 (1967); *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677 (1972).

Defendant's second assignment of error is overruled.

[4]    Defendant assigns as error the admission of his statements to the officers on September 11th, but he does not contend that these were either involuntary or made without understanding. He contends that the memorandum from which Deputy Sheriff Munn read while testifying as to the statements constituted secondary evidence; that the tapes which recorded the conversation were the best evidence. Munn testified that the paper from which he read was "a verbatim transcript" of the statement which Fish made to him and the other officers in the presence of his codefendants. It was defendant's oral confession which was offered and admitted in evidence, and it was permissible for Munn to read from a transcript which, according to his sworn testimony, recorded the exact words used by the accused in his presence.

A properly authenticated recording of an accused's confession if voluntary and otherwise lawful is admissible in evidence. *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971); *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971); *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970). However, the fact that a re-

cording has been made of an oral confession does not prevent one who heard the confession from testifying as to what was said. *State v. Fox, supra.* "[U]nless the effort is to prove the contents of the recording as such, as distinguished from proof of the statement or conversation which was recorded, the best evidence rule . . . does not apply to *require* the introduction of the recording, *S. v. Fox, supra.*" Stansbury's N. C. Evidence (Brandis Rev., 1973) § 32 n. 95. *See also* § 191 n. 24. We note that defendant made no request for the production of the tapes. Assignment of error No. 3 is overruled.

Defendant's assignment No. 4 is: "The Court erred when it did not allow the mother of the defendant or a medical expert to answer questions pertaining to the defendant's medical history. Exceptions Nos. 8, 9 (R p 77), 10 (R p 78), and 12 (R p 80)." Assignment No. 5 is: "The Court erred when it disallowed answer to question as leading questions propounded to an expert, which pertained to facts that led to the expert's opinion of the mental capacity of the defendant. Exceptions Nos. 11 (R p 79), 13, 14 (R p 80), and 15 (R p 81)."

[5] Assignments Nos. 4 and 5 present no questions for this Court's consideration. Rule 19(3) of the Rules of Practice in the Supreme Court require that an assignment to the exclusion or admission of evidence show specifically what question appellant intends to present. This means that the question to which the objection was sustained and the answer which the witness would have made had he been permitted to answer must be set out in the assignment. *State v. Gainey,* 280 N.C. 366, 185 S.E. 2d 874 (1972) ; *Grimes v. Credit Company,* 271 N.C. 608, 157 S.E. 2d 213 (1967) ; *In Re Will of Adams,* 268 N.C. 565, 151 S.E. 2d 59 (1966). Where the court sustains an objection to evidence and the record fails to show what the evidence would have been, the exclusion of such evidence cannot be held prejudicial. *State v. Mabry,* 269 N.C. 293, 152 S.E. 2d 112 (1967) ; 3 Strong's N. C. Index 2d *Criminal Law* § 169 (1967). Here, in each instance, the record fails to show the answer sought to be elicited. We note, however, that evidence of the import suggested by several of the questions had been previously admitted without objection and that none of the rulings suggest prejudicial error.

In his brief, Fish expressly abandons his assignments of error Nos. 6 and 7. Assignment of error No. 8 is: "The Court erred by giving an erroneous summation of the evidence. Ex-

ception No. 19 (R p 88)." This assignment likewise fails to comply with Rule 19(3) of the Rules of Practice in the Supreme Court, which requires that the portion of the charge which appellant contends to be erroneous shall be set forth in the assignment itself. *State v. Robinson,* 272 N.C. 271, 158 S.E. 2d 23 (1967); 3 Strong's N. C. Index 2d *Criminal Law* § 163 (1967). Notwithstanding, we have read page 88 of the record and on it we find no error prejudicial to defendant.

In the trial of defendant Fish we find no error.

### APPEAL OF DAVIS AND HONEYCUTT

[6]   Davis and Honeycutt each assign as error the court's refusal to allow their motions for nonsuit. The State's evidence as to Davis, excluding the extrajudicial statements of his codefendants and all evidence which the court instructed the jury not to consider against him, tends to show the following facts:

About 1:30 p.m. on 29 August 1972 law enforcement officers found Mr. Bunn's dead body across the threshold of his store, a two-inch hole in his chest. A trail of blood led from a counter in the store to the body. (This evidence was also competent as to Honeycutt.)

About 11:00 a.m. on 29 August 1972 Davis was the passenger in a burgundy Dodge automobile which Fish backed up to the door of Mr. Bunn's store. Davis got out, followed by Fish, who was waving a sawed-off shotgun. Fish forced Bunn, who had been standing in the yard, into his store. *All three of them went into the store.* Thereafter Ricky Pope, who was observing these proceedings, heard a shot. In about a minute *Fish and Davis* came out of the store and sped away in the burgundy Dodge. Later that afternoon the officers found the Dodge on the path into the wooded area from which Ricky had seen a white truck emerge as he left the vicinity of Bunn's store.

About 2:00 p.m. that afternoon Davis, Fish, and Honeycutt were together at Fish's residence in Raleigh. On 9 September 1972 Wake County officers returned Fish and Davis to Raleigh from a Texas town about 90 miles from the Mexican border. Two days later, after being fully warned of his constitutional rights, Davis told the officers that on August 29th he and two other friends, after talking for a while, "went to Clayton and got a car." Then they went to Mr. Bunn's store, and while he and his friend were there Bunn was shot and killed. Thereafter they "got rid of the car and went on and left."

After making the above statement Davis told the officers that if they would permit him, Fish, and Honeycutt to talk "they would get a complete statement straightened out." The officers permitted the defendants to confer privately and thereafter Davis made the statement which has been heretofore set out in full in the preliminary narrative of the evidence. In his second statement Davis said that he, Fish, and Honeycutt went to Clayton and got the car in which he and Fish drove to Bunn's store; that he stood outside, and "Mr. Bunn went in first and Mack followed in behind"; that he heard a gun go off and saw Bunn fall; that they then left, ditched the car in the woods, rode back to Raleigh with Wallace Honeycutt, and then they left.

The State's evidence against Honeycutt, excluding the evidence which the court instructed the jury not to consider against him, tends to show:

On 27 August 1972, the Sunday before Mr. Bunn was killed, Honeycutt was at Fish's home. There Debra Garland Nipper heard Fish and Honeycutt "talking about a service station or something." Honeycutt told Fish that the man who ran the store always had money but he kept a gun in a cigar box; that he was an old man, not too smart, and it shouldn't be hard to rob him. About 2:00 p.m. on Tuesday, 29 August 1972, about one hour after Mr. Bunn was killed, Honeycutt was at Fish's residence with him and Davis.

On 11 September 1972 Fish, Davis, and Honeycutt, who were in the Wake County jail, after being fully advised of their constitutional rights, were permitted to confer privately. After being alone for 15-20 minutes they knocked on the door of their conference room and the officers went in. Thereupon Davis and Fish made the statements which have heretofore been set out in full in the preliminary summation of the evidence. After Davis and Fish had concluded their statements, Officer Munn asked Honeycutt if the statements by Fish and Davis were true and he said that they were.

In his statement with reference to Honeycutt, Davis said that on August 29th about 12:30 p.m. Honeycutt and Fish picked him up at a friend's home; that they then went to Clayton and got the car in which he and Fish went to Bunn's store; that after Mr. Bunn was shot they "ditched the car in the woods and rode back to Raleigh with Wallace Honeycutt. . . ."

Fish's statement contains the following reference to Honeycutt: (After leaving Bunn's store Fish drove the automobile down a dirt path on the other side of the bridge.) "I turned down there and the best I remember—like Wallace [Honeycutt] he was pretty drunk and I told him, I said, 'Man I can drive a lot better than you anyway' so I got in the car—made him get in the truck or something. Anyway I ended up driving. . . . I don't think we stopped any place else to get any beer or anything; but anyway I ended up home and then I pulled out some dope and I rolled up some joints and we all smoked some dope and Wallace, he passed out on the bed. . . ."

All admitted evidence, competent and incompetent, is for consideration in passing upon the motions for nonsuit. *State v. Stallings,* 267 N.C. 405, 148 S.E. 2d 252 (1966). However, considering the preceding evidence, unaugmented by the statements of codefendants and in the light most favorable to the State, *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967), the State's evidence is sufficient to establish the following facts:

Fish, Davis, and Honeycutt conspired to rob Mr. Bunn at his store. For that purpose the three went to Clayton, where they stole a burgundy Dodge. While Honeycutt waited for them in a truck at a parking place in a wooded area nearby, Fish and Davis drove the stolen Dodge to Bunn's store. In the attempt to rob him Fish shot and killed Bunn. Immediately thereafter he and Davis drove the Dodge to the area where Honeycutt awaited them. There they abandoned the Dodge and returned in Honeycutt's truck to Fish's home in Raleigh, where Honeycutt passed out after smoking some dope. Later in the afternoon Davis and Fish left Raleigh and eleven days later were apprehended in Hondo, Texas.

We hold the foregoing facts sufficient to sustain the jury's verdict that Davis and Honeycutt were guilty of the felony-murder with which each was charged.

We next consider the court's refusal to grant the motions of Davis and Honeycutt for trials separate and apart from each of their codefendants.

Prior to the decision in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968), whether defendants indicted for the same crime would be tried jointly or separately was a matter resting in the sound discretion of the trial judge.

*State v. Battle,* 267 N.C. 513, 148 S.E. 2d 599 (1966). In the absence of a showing that a joint trial had deprived the objecting defendant of a fair trial, the court's exercise of its discretion would not be disturbed upon appeal. When the extrajudicial confession of one defendant which implicated another against whom it was inadmissible, was offered in evidence, the trial judge admitted it with an instruction that the confession was evidence only against the confessor and must not be considered against the codefendant. *State v. Lynch,* 266 N.C. 584, 146 S.E. 2d 677 (1966).

[7]  In *Bruton,* the Supreme Court held that, in a joint trial, the admission of a confession which implicated a codefendant violated his Sixth Amendment right of confrontation when the confessor did not take the stand so that he could be cross-examined. In consequence of *Bruton,* in *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968), we hold "that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant (see *State v. Bryant, supra* [250 N.C. 113, 108 S.E. 2d 128], and (2) that the declarant will not take the stand. If the declarant can be cross-examined a codefendant has been accorded his right to confrontation." *Id.* at 291, 163 S.E. 2d at 502. *See State v. Kerley,* 246 N.C. 157, 97 S.E. 2d 876 (1957).

[8]  Since none of the three defendants in this case testified, both Davis' and Honeycutt's first assignment of error presents the question whether, in the joint trial, the admission of incriminating statements by a codefendant constituted prejudicial error against the objecting defendant. Under the rule we laid down in *Fox* and subsequent cases Davis and Honeycutt will each be entitled to a new trial unless the statements were competent against the nondeclarant or, if incompetent, their admission was harmless beyond a reasonable doubt. In *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969), and *State v. Parrish,* 275 N.C. 69, 165 S.E. 2d 230 (1969), new trials were awarded. For cases holding that the trial court's infraction of the *Fox* rule was harmless beyond a reasonable doubt, *see State v. Jones,* 280 N.C. 322, 185 S.E. 2d 858 (1972); *State v. Fletcher*

State v. Davis and State v. Fish

and *State v. St. Arnold,* 279 N.C. 85, 181 S.E. 2d 405 (1971) ;
*State v. Swaney,* 277 N.C. 602, 178 S.E. 2d 399 (1970) ; *State
v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970).

The jury was instructed not to consider against Davis the
following evidence which was admitted over his objection:

(a) Debra Garland Nipper's statement that on August 27th
she heard Fish and Honeycutt talking about a filling station and
that Honeycutt told Fish the man who ran the store always had
a lot of money; that he had a gun, but he kept it in a cigar box;
that he was an old man, not too smart, and it should not be hard
to rob him. (b) Nipper's statement that on August 29th Fish
told Wall "he had had to do a man a job"; "that the man pulled
a gun on him and it was either his life or the other man's." (c)
Wall's statement that Fish told him on August 29th that "They
had went and the man had pulled a gun on them and it was
either one of them getting shot," and that he had to shoot him.
(d) The gun, State's Exhibit No. 1. (e) Fish's letter of Novem-
ber 7th to the judge.

In addition to the foregoing evidence Davis assigns as
error the admission of Fish's statement, made September 11th,
and of Honeycutt's statement that the statements of Fish and
Davis were correct. These statements were admitted generally.

Honeycutt also objected to statements (b) and (c) and the
gun (d), set out above in the enumeration of Davis' objections,
and the jury was instructed not to consider this evidence (ad-
mitted only as to Fish) against Honeycutt. In addition Honeycutt
objected to the statements which Fish and Davis made on Sep-
tember 11th. His objections were overruled and these statements
were admitted without restriction.

Under the rule enunciated in *Bruton* and *Fox* the court's
attempt to restrict the application of any of the foregoing evi-
dence to a specified defendant was a futile gesture. The admis-
sion of statements (a), (b), (c), the letter (e) and the
statements which Fish and Honeycutt made to the officers on
September 11th, which the court admitted generally, denied
Davis his constitutional right of confrontation and cross-
examination guaranteed by the Sixth and Fourteenth Amend-
ments. *State v. Brinson, supra. See also* Stansbury's N. C.
Evidence (Brandis Rev. 1973) § 179. The admission in evidence
of items (b), (c) and (e) deprived Honeycutt of the same

right. The admission of the gun (d), which Ricky Pope identified as the gun he saw Fish take into Bunn's store, was not error as to either. Nor was the admission of the statements of Fish and Davis error as to Honeycutt, who adopted them when he told the officers that they were true.

It is our view, however, that competent evidence against both Davis and Honeycutt so positively establishes their guilty participation in Bunn's murder that the incompetent evidence, even in its totality, was harmless beyond a reasonable doubt. The test of harmless error is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Brinson, supra* at 295, 177 S.E. 2d at 404.

Competent evidence as to Honeycutt establishes that he was the author of the plan to rob Mr. Bunn. Competent evidence as to both Davis and Honeycutt establishes that the three defendants went together to Clayton where they "got" the car in which Davis and Fish drove to Bunn's store; that Honeycutt waited in a truck at the wooded parking area about a mile from the store while Fish and Davis went there to rob Bunn; that Fish, by means of a shotgun, forced Bunn into his store and Davis followed; that while those two were in the store Bunn was shot and killed and they fled in the Dodge; that a few minutes later a truck came out of the entrance to the wooded parking area, where later that afternoon officers found the Dodge in which Fish and Davis went to Bunn's store; that about 1:30 p.m. the officers found Bunn's dead body lying across the threshold to his store, a two-inch hole in his chest; that in less than an hour after Davis and Fish left Bunn's store in the Dodge they and Honeycutt were at Fish's home in Raleigh.

To the foregoing basic facts the details contained in confessions of codefendants and the statements which Fish made to Nipper and Wall add nothing of significance. Without them we have no doubt that the verdicts would have been the same. *See State v. Jones, supra; State v. Brinson, supra.*

[9]  Davis' assignment of error which challenges the validity of the two statements which he made to the officers on September 11th, and Honeycutt's assignment of error challenging the admissibility of his statement to the officers that the Davis and Fish statements of September 11th were true, are without merit. Before admitting the challenged statements the court conducted

a *voir dire* on which he heard the witnesses for the State and the testimony of Davis and Honeycutt. Thereafter, upon supporting evidence, he found that the three statements were made freely, understandingly, and voluntarily. These findings are conclusive on appeal. *State v. Roseman,* 279 N.C. 573, 184 S.E. 2d 289 (1971).

After considering defendants' other assignments of error we deem it unnecessary to discuss them. None discloses prejudicial error.

[7] In concluding this labored opinion we are constrained to note that it points up the hazards which lie in wait for the State when it moves to consolidate such cases as these for trial. After the judge allowed the solicitor's motion to consolidate, both seem to have proceeded under the law as it existed in the era before *Bruton* and *Fox*. Both ignored the *Fox* pronouncement that in a consolidated trial all portions of an extrajudicial confession or incriminating statement by one defendant which implicate a codefendant are inadmissible unless (1) special circumstances render the statement also admissible against the codefendants, or (2) the defendant making the statement takes the stand so that he may be cross-examined. *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492, 502 (1968).

In the trial, as to each of the three defendants, we find no prejudical error.

No error.