STATE OF NORTH CAROLINA v. MARK DOUGLAS BURNS

No. 29

(Filed 6 May 1975)

1. Criminal Law § 66— in-court identification — pretrial showup — admissibility

In this rape prosecution, the victim's in-court identification of defendant as her assailant was of independent origin, there was no substantial likelihood of misidentification at a pretrial police station showup, and the in-court identification and evidence of the pretrial showup identification were properly admitted in evidence where the victim was with her assailant in a small, well lighted room for at least fifteen minutes, the victim gave police officers a description of her assailant which closely corresponded to defendant's appearance, the victim made no identification of others at six previous showups or from viewing over 1,500 photographs, other witnesses identified defendant as a man observed by them in the restaurant where the crime occurred at about the time of the crime, and the showup identification occurred a week after the crime and the in-court identification occurred less than two months after the crime.

2. Rape § 1— threat of bodily harm

A threat of serious bodily harm which reasonably induces fear thereof constitutes the requisite force and negates consent in a rape case.

3. Rape § 5— sufficiency of evidence

The State's evidence was sufficient for the jury in a prosecution for a rape which allegedly occurred in the rest room of a restaurant.

4. Constitutional Law § 30; Criminal Law § 101— due process — statement by radio commentator — failure to instruct jury

Defendant in a rape case was not denied due process by reason of the trial judge's failure to instruct the jury concerning criticism by an undesignated radio commentator of another jury which, during the same week, had found another defendant not guilty of rape where the record does not indicate the nature of such comment and does not show that any juror heard the statement of which defendant complains.

State v. Burns

5. **Constitutional Law § 36; Criminal Law § 135; Rape § 7— death penalty for rape**

   Imposition of the death penalty for rape did not violate defendant's rights under the Eighth and Fourteenth Amendments.

   Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to the death sentence.

APPEAL from *Cowper, J.,* at the 28 February 1974 Criminal Session of ONSLOW.

Upon an indictment, proper in form, the defendant was charged with the rape of Mrs. Deborah Williams. His defense was alibi. He was found guilty as charged and was sentenced to death. The in-court identification of the defendant by Mrs. Williams as the perpetrator of the offense was positive and unequivocal. Prior to such identification, a voir dire was conducted in the absence of the jury and the court made findings of fact as set forth below.

The testimony of Mrs. Williams, in the presence of the jury, was to the following effect:

She resides in Raleigh and on 10 January 1974 traveled to Onslow County to visit her husband, a member of the Marine Corps, stationed at the New River Air Station. Upon her arrival, they went to McDonald's Restaurant for their evening meal, arriving at the restaurant about 8:15 p.m. While her husband placed their order, Mrs. Williams went to the ladies' rest room. To reach it, she walked past tables and booths in the dining area to a door to the rest room area, which contained both a ladies' room and a men's room. As she did so, she observed a man in one of the booths staring at her. He wore a brown corduroy coat. His hair was cut short as if he were a member of the Marine Corps.

The entire restaurant, including the small ladies' room was well lighted. Entering the ladies' room, she tried several times to lock the door but it would not lock. As she was using the toilet, someone started to enter. She tried unsuccessfully to keep the door closed. The defendant came in, put a sharp object, which she could not see but believed to be a knife, against her neck and told her that if she did as he directed he would not hurt her. Turning around, the defendant fixed the door so that it would lock and locked it.

After forcing her to perform an unnatural sexual act, which she did because of her fear that if she refused he would kill her, he then proceeded to have complete sexual intercourse with her, which she did not resist because she feared he would kill her if she did not obey his instructions. Thereupon, he tied and gagged her with her own clothing and left the rest room, the entire episode having taken fifteen or twenty minutes.

Her assailant wore a brown corduroy coat and brown and white checked pants, was six feet tall and skinny. He had a medium colored mustache and dark hair. He was the man she had observed sitting in the booth and staring at her. The coat (State's Exhibit 3) which the defendant was wearing at the time of his arrest, one week later, looks like the one her assailant wore.

As soon as she released herself, Mrs. Williams returned to the dining area of the restaurant and told her husband she wanted to leave. When they got outside the restaurant she told him what had occurred. They went to the police station, where she told the officers what had happened and that her assailant was about as tall or taller than her husband (six feet), that he had dark hair and a dark mustache, wore a brown corduroy coat and was "real skinny," weighing, in her opinion, 120 to 125 pounds. (The defendant is six feet three inches tall and weighs 145 to 150 pounds.) Then she went to the hospital for a medical examination. (The examining physician testified that he found evidence of sexual intercourse within the preceding three or four hours, his examination having occurred at 10:00 p.m.)

She returned to the police station that evening and on the following day to look at different men whom the police had taken into custody and each of whom, in succession, the officers told her they were "almost positive" was the perpetrator of the offense. She did not identify any of these men as her assailant. During the following week, she looked at approximately 2,000 police "mug shot" photographs without identifying any of the subjects of these as her assailant. (No photograph of the defendant was among those so examined by her.)

One week after the offense, the officers again requested Mrs. Williams to come to the police station to view a man whom they "thought" was the man who had attacked her. She stood at the window of a darkened room while the officers brought the defendant out into a courtyard. He was not in a lineup. Mrs.

Williams then said she was "almost sure" this was her assailant but she wanted to see him closer. (The defendant was then brought into the room where Mrs. Williams was and she definitely identified him as her assailant.)

She is positive that the defendant is the man who raped her.

On the above mentioned voir dire, the defendant offered no evidence. The testimony of Mrs. Williams, the only witness for the State, was to the following effect:

The dining area and the rest room of the restaurant were well lighted. When she saw the defendant at the police station, a week after the attack upon her, she was inside the station, he outside, about 20 feet from her, standing with three other men (police officers), all in civilian clothes, one known to her. She then said she believed he was her assailant but she "really wanted to be positive" and, at her request, she was taken into the same room with the defendant and stood five or six feet from him. She thereupon told the officers the defendant was the man who had raped her. On the day following the offense, she had looked at approximately 2,000 pictures and, during the intervening week, had looked at several men at the police station at the request of the officers without identifying as her assailant any of these men or any of the men portrayed in the pictures she examined. Each time she went to the police station to look at a man in custody, the officers told her they were "pretty sure they had the guy." She testified, "My identification of the defendant here in the courtroom is based entirely upon what I observed that night at McDonald's, independent of anything I observed about the defendant at the police station." When, on the night of the offense, she described her assailant to the officers as weighing 120 to 125 pounds, she "just knew he was real skinny," she not being a judge of weight. Her husband was with her at this confrontation. He was not sure and wanted to see the defendant again, so the officers turned the defendant "sideways" so that her husband could get a side view.

At the conclusion of the voir dire, the court found:

The restaurant, including the rest room, was well lighted. The witness had an opportunity to observe her assailant fifteen to twenty minutes. She saw him face to face and was able to describe him and his clothing. She was called upon by the police officers on six occasions to view persons suspected of the

attack but did not identify any of them as her assailant. She looked through approximately 2,000 photographs of suspects without making any identification therefrom. One week after the attack, she was again called to the police station and asked to observe a man. On this occasion, she stated she thought this was the man who had attacked her and asked to see him closer, whereupon she was brought into a room with the suspect and identified him as her assailant. The defendant was then standing alone, there being no lineup. The in-custody viewing of the defendant one week following the alleged rape and the circumstances surrounding the same were not impermissibly suggestive and conducive to irreparable mistaken identity. The in-court identification of the defendant was of independent origin based on observations of the defendant on 10 January 1974, and based solely on what she saw at the time of the crime and does not result from any out-of-court confrontation.

The court thereupon overruled the defendant's objection to the above related testimony of Mrs. Williams concerning the identification of the defendant.

The husband of the prosecuting witness testified, without objection, to the following effect:

He and his wife reached McDonald's Restaurant between 8:00 p.m. and 8:15 p.m. He placed their order while she went to the rest room. He sat in the dining area facing the door to the rest room area. He observed the defendant come out of that door and walk rapidly out of the back door of the restaurant. The defendant was wearing a brown corduroy or suede jacket. About two minutes later, between 8:30 p.m. and 8:45 p.m. Mrs. Williams came out looking as if she were ill and asked him to leave, which they did. Outside the restaurant she told him what had happened and they went to the police station.

As the defendant walked from the door to the rest room area to the exit from the restaurant, Mr. Williams got a good view of his profile and noted a somewhat strange shape of the defendant's forehead. At that time he had no particular reason to observe the defendant except that the defendant appeared to be nervous. At the police station, Mr. and Mrs. Williams described the defendant to the officers as six feet tall, not as heavy as Mr. Williams, having a mustache, a little bushier than that of Mr. Williams, and dark hair but not as dark as that of Mr. Williams, and wearing a corduroy or heavy suede brown jacket.

He also examined the police collection of approximately 2,000 "mug shots" and looked at several suspects at the police station before he saw the defendant. Neither he nor Mrs. Williams identified any of the other men or the subject of any of the "mug shots" as her assailant. He is positive that the defendant is the man he saw come from the rest room area of the restaurant.

Donna Fountain, a waitress at the restaurant, testified, without objection, that she saw the defendant sitting in a booth in the dining area between 7:50 p.m. and 8:30 p.m. on the evening the rape occurred, "looking around." He was then wearing a brown corduroy jacket and had a mustache. She heard the door to the rest room area close and thereafter observed the defendant leave the booth in the dining area, following which she again heard the door to the rest room area close. That night she told the police that the man she had observed was tall, with dark hair and a mustache and was wearing a brown corduroy jacket.

Bernice Lee Graham, assistant manager of the restaurant, testified that he observed the defendant in the restaurant between 8:00 p.m. and 8:30 p.m. on the evening the offense occurred. The defendant's manner and response to Mr. Graham's inquiry attracted his attention. On January 17, one week after the offense, Mr. Graham again observed the defendant sitting in the rear booth of the dining area. On that occasion, upon being advised by one of the waitresses that she had found a piece of paper jammed in the door lock of the ladies' rest room, Mr. Graham checked and found this to be true. He did not remove it but returned to the dining area, took a good look at the defendant and called the police.

Detective Hassell of the Jacksonville Police Department testified that, on the night of the offense, Mr. and Mrs. Williams each gave him a description of her assailant, these being consistent. Upon his going to the restaurant, waitress Fountain told him she had observed a man fitting that description sitting in the restaurant and Manager Graham, without having previously been told what description had been given by Mr. and Mrs. Williams, similarly described the man he had observed. Detective Hassell then went into the ladies' rest room and found a small, folded piece of paper napkin about half an inch square.

Detective Lieutenant Reed of the Jacksonville Police Department testified:

The defendant's picture was not in the "mug books" examined by Mr. and Mrs. Williams. She did not identify, as her assailant, any of the six suspects she was shown prior to her identification of the defendant, saying, as to each, he was shorter, taller, or heavier than her assailant.

On January 17, Mrs. Williams identified the defendant as her assailant. She and her husband were inside the police station in a darkened room looking out a window into a courtyard. The defendant and three officers in civilian clothing walked out of the police station into the courtyard. The officers, though about the same height as the defendant, were substantially heavier. The defendant wore a brown coat (State's Exhibit 3). One of the officers also wore a brown coat, slightly lighter in shade. Mrs. Williams identified the defendant as her assailant but wanted a closer look to be sure, so the defendant was brought into a small room where Mr. and Mrs. Williams observed him at a distance of about three feet. She then positively identified him as her assailant.

Mr. Williams wanted a side view, so the officers had the defendant turn sideways. Mr. Williams then identified him as the man he saw coming from the rest room area of the restaurant. (The record at this point shows an exception by the defendant but the record does not show any objection to any question propounded to this witness.)

Before Lieutenant Reed and another officer arrested the defendant on the evening of January 17, they observed him for a substantial period as he sat in a booth in the dining area of McDonald's Restaurant, facing the door to the rest room area. As the officers went by, he covered his face with his hand. Lieutenant Reed, having been informed that one of the waitresses had found a plug of paper in the slot for the lock to the door of the ladies' rest room, went to the rest room and found a piece of folded paper napkin (State's Exhibit 4) jammed into the slot for the door lock, as the result of which the lock would not close.

The defendant was informed of the matter under investigation and was advised of his constitutional rights, including his right to counsel. He said he did not want a lawyer as he had

not done anything, having been at the "Devil's Den" (a so-called private club) all through the evening of January 10. Though asked to do so, he did not give the officers the name of any person who was with him there. When arrested, the defendant was carrying a small switchblade knife (State's Exhibit 6).

The defendant testified in his own behalf to the following effect:

He did not rape Mrs. Williams. He does not own any brown and white checked pants. On the night of January 10, he was at the "Devil's Den" at all times from 6:00 p.m. to approximately 11:00 p.m. Membership in the "Devil's Den" is obtained by being introduced to the manager and receiving her approval of the applicant's appearance. He was in McDonald's Restaurant on the evening when arrested but did not go into the rest room area, and put nothing in the door lock slot. He is a member of the Marine Corps, stationed at Camp LeJeune. The knife found in his pocket is his.

A waitress at the "Devil's Den," the bartender thereat and a member thereof all testified that they saw the defendant at the "Devil's Den" on the evening of January 10 prior to 8:00 p.m. None of them saw him there after 8:00 p.m. on that date. The "Devil's Den" is three miles from McDonald's Restaurant. The defendant had an automobile.

The defendant's commanding officer, his fiancee and her mother testified that his character is good.

*James H. Carson, Jr., Attorney General, and Sidney S. Eagles, Jr., Assistant Attorney General, for the State.*

*Cameron and Collins by William M. Cameron, Jr., for defendant.*

LAKE, Justice.

[1] The defendant contends that the trial court erred in admitting in evidence the in-court identification of the defendant by Mrs. Williams as her assailant. In this we find no error. Upon the defendant's objection to such testimony, the trial judge sent the jury from the courtroom and, in its absence, conducted a voir dire examination. Mrs. Williams was the only witness called on the voir dire. At the conclusion thereof, the court made findings of fact, as above set forth, and overruled the defendant's

motion to suppress the evidence pertaining to the identification of the defendant by Mrs. Williams. This was the proper procedure. *State v. Cross*, 284 N.C. 174, 178, 200 S.E. 2d 27; *State v. Stepney*, 280 N.C. 306, 314, 185 S.E. 2d 844; *State v. Gray*, 268 N.C. 69, 78, 150 S.E. 2d 1.

One of the court's findings, designated by it a conclusion, was that the in-court identification of the defendant was of independent origin and was based solely on what the witness saw at the time of the crime and was not the result of any out-of-court confrontation. The witness expressly so testified on the voir dire. The circumstances of the crime, committed in a small, well lighted room in which she was confronted by her assailant, a forcible intruder, who remained therein with her for at least fifteen minutes, were such as to afford ample opportunity for the formation of a mental picture of her assailant which would survive to the time of trial, irrespective of her pretrial confrontation with him thereafter at the police station. The trial court's findings of fact on the voir dire, supported as they are by ample evidence, are conclusive on appeal. *State v. Cross, supra,* at p. 181; *State v. Stepney, supra,* at p. 317; *State v. Morris*, 279 N.C. 477, 481, 183 S.E. 2d 634; *State v. Harris*, 279 N.C. 307, 311, 182 S.E. 2d 364; *State v. Gray, supra.*

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 2d 401, the defendant, as here, appealed from a conviction of rape. He, like the present defendant, contended that the state court's admission of the victim's in-court identification of him as her assailant and the admission in evidence of her testimony of her out-of-court identification of him constituted a violation of the Due Process Clause of the Fourteenth Amendment. In that case, the victim testified that she was seized from behind and thrown to the floor of a room of her residence lighted only by the light from an adjoining room. The rape was committed in a wooded area, two blocks from her home, to which area she was forced to walk, the offense being committed under the light of a full moon and the entire incident taking between fifteen minutes and half an hour. The victim gave the police a description of her assailant, including an estimate of his age, height and weight, and a description of his hair and complexion. Over a period of seven months between the offense and the trial, she viewed a number of suspects, some in lineups and others in showups, and was shown between 30 and 40 photographs, identifying none of these suspects as her assailant. Seven months after the

offense, the police called her to the police station to view the respondent who was exhibited to her in a showup consisting of two detectives walking the defendant past the victim. The police, at her request, required the defendant to say, in her presence, words spoken by her assailant at the time of the crime. It did not appear whether these words were spoken before or after the victim first identified the defendant as her assailant.

It is apparent that the present case is almost on all fours with *Neil v. Biggers, supra,* such differences as there are between the two situations indicating even greater reliability of the identification in the present case. The United States District Court granted habeas corpus, holding the showup identification procedure violated the Due Process Clause. The Supreme Court of the United States, speaking through Mr. Justice Powell, reversed, saying:

> "In *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967 (1967), the Court held that the defendant could claim that 'the confrontation conducted * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' Id., at 301-302, 18 L.Ed. 2d 1199. This, we held, must be determined 'on the totality of the circumstances.' * * *

> "Subsequently, in a case where the witnesses made in-court identifications arguably stemming from previous exposure to a suggestive photographic array, the Court restated the governing test:

>> '[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S. 377, 384, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968).

> * * *

> "Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable

misidentification.' *Simmons v. United States*, 390 U.S., at 384, 19 L.Ed. 2d 1247, 88 S.Ct. 967. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster* [*Foster v. California*, 394 U.S. 440, 22 L.Ed. 2d 402, 89 S.Ct. 1127 (1969)]. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.

\*          \*          \*

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

\*          \*          \*

"We find that the District Court's conclusions on the critical facts are unsupported by the record and clearly erroneous. The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and

voice, might not have satisfied Proust but was more than ordinarily thorough. She had 'no doubt' that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant.

\*     \*     \*

"Weighing all the factors we find no substantial likelihood of misidentification. The evidence was properly allowed to go to the jury."

In *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10, the defendant, charged with rape, assigned as error the admission, over his objection, of an in-court identification of him by the victim as her assailant. The ground of objection, as here, was that the witness had made an out-of-court identification under circumstances which were impermissibly suggestive and conducive to mistaken identification. We were there concerned only with the admissibility of the in-court identification testimony. Speaking through Justice Branch, we said:

"The practice of showing suspects singly to persons for purposes of identification has been widely condemned. *Stovall v. Denno* [388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967]; *State v. Wright* [274 N.C. 84, 161 S.E. 2d 581]. However, whether such a confrontation violates due process depends upon the totality of the surrounding circumstances. *Stovall v. Denno, supra.* \* \* \*

"It is well established that the primary illegality of an out-of-court identification will render inadmissible the in-court identification unless it is first determined on voir dire that the in-court identification is of independent origin."

In the present case, the trial court having found that the in-court identification was of independent origin, which finding was supported by substantial evidence on voir dire and is, therefore, conclusive upon appeal, there was no error in admitting the in-court identification of the defendant by Mrs. Williams. Her testimony so identifying the defendant was clear and unequivocal.

In addition to Mrs. Williams' husband, other witnesses identified the defendant as a man observed by them in the restaurant at about the time of the offense. He was arrested in the same restaurant one week later, on which occasion the lock to the door of the ladies' rest room was similarly jammed so that the door could not be locked. The defendant's evidence, designed to establish an alibi for the time of the offense, obviously fails to do so. Immediately after the offense was perpetrated, Mrs. Williams gave the police officers a description of her assailant which closely corresponded to the defendant's appearance. Her in-court identification of him occurred less than two months after the offense. Prior to her out-of-court identification of the defendant, one week after the offense, she viewed six other suspects, each of whom was exhibited to her at a showup as suggestive as was that involving the defendant, and she examined over 1,500 photographs. She did not identify any of these suspects or the subject of any of these photographs as her assailant. No photograph of the defendant was included among those examined by her. Prior to each of the other showups, just as at the showup of the defendant, the police officer having the man in custody told Mrs. Williams he was sure that suspect was her assailant. In each case, she pointed out some respect in which that suspect failed to conform to her mental picture of her assailant.

In the present case, the totality of the circumstances is such that, far from showing the out-of-court identification, one week after the offense, was "conducive to irreparable mistaken identification," it shows just the contrary. It shows a witness with a clear mental picture of her assailant, which was not blurred or confused by successive confrontations with suspects, each of whom she knew the police officers believed to be her assailant. Quite obviously, Mrs. Williams, in her identification of the defendant at the police station, was not influenced by the opinion of the officers nor was she interested in identifying someone just to be done with the matter. On the contrary, she laboriously searched through hundreds of photographs unsuccessfully and made trip after trip to the police station to view suspects. Clearly, her sole objective was to identify the right man and she would not yield to any other suggestion.

The prosecuting attorney, having introduced the clear, positive, in-court identification of the defendant by Mrs. Williams, did not offer before the jury any evidence concerning the out-of-

court identification by her until after the defendant had developed this by his cross-examination of Mrs. Williams in the presence of the jury. Having, himself, brought to the attention of the jury the fact of, and some of the circumstances surrounding, the out-of-court identification for the purpose of discrediting the in-court identification of him by Mrs. Williams, the defendant is not in a position to object to the introduction of testimony by the State for the purpose of giving the jury the complete picture of the proceeding at the police station, even if it be assumed that such evidence by the State would have been incompetent otherwise. *State v. Minton,* 234, N.C. 716, 724, 68 S.E. 2d 844; *State v. Hicks,* 233 N.C. 511, 518, 64 S.E. 2d 871; *State v. Warren,* 227 N.C. 380, 42 S.E. 2d 350; Strong, N. C. Index 2d, Criminal Law, § 39. See also, *State v. McVay* and *State v. Simmons,* 277 N.C. 410, 417, 177 S.E. 2d 874. Furthermore, the State's evidence as to the out-of-court identification merely added to the evidence elicited by the defendant the circumstances surrounding that identification which the defendant says impairs the reliability of the identification. Having, himself, shown the fact of the out-of-court identification, we do not perceive any prejudice to him by the subsequent showing of the circumstances under which it occurred.

Finally, as to this point, assuming, which we do not concede to be correct, that there was error in permitting Mrs. Williams to testify on redirect examination, and Detective Lieutenant Reed to testify on direct examination, concerning the out-of-court identification of the defendant by Mrs. Williams, we think it clear that such error was harmless beyond a reasonable doubt in view of the positive, unequivocal, in-court identification by Mrs. Williams, the identification of him by other witnesses as a man observed by them in the restaurant about the time of the offense and the evidence of the similarly jammed door lock one week later when the defendant was again in the restaurant. It is inconceivable that, had there been no evidence at all before the jury concerning the out-of-court identification, the verdict would have been different. New trials are not granted because of errors which cannot reasonably be believed to have contributed to the result reached in the trial court. *State v. Turner,* 268 N.C. 225, 232, 150 S.E. 2d 406; *State v. Beal,* 199 N.C. 278, 154 S.E. 604; *State v. Mundy,* 182 N.C. 907, 110 S.E. 93; Stansbury, North Carolina Evidence, Brandis Revision, § 9.

The defendant's contention that there was error in the denial of his motion for a directed verdict of not guilty is obviously without merit. Such motion is equivalent to a motion for a judgment of nonsuit. *State v. Clanton,* 278 N.C. 502, 180 S.E. 2d 5; *State v. Davis,* 246 N.C. 73, 97 S.E. 2d 444. It is elementary that upon such motion the evidence for the State is deemed to be true, the State is entitled to the benefit of every inference in its favor which may reasonably be drawn therefrom and the defendant's evidence in conflict therewith is disregarded. Strong, N. C. Index 2d, Criminal Law, § 104, and the many cases there cited. "Where, taken in the light most favorable to the State, there is sufficient evidence from which a jury could find that the offense charged had been committed and that defendant committed it, nonsuit should be denied." *State v. Cooke,* 278 N.C. 288, 179 S.E. 2d 365.

[2, 3] Rape is sexual intercourse with a female person by force and without her consent. *State v. Henderson, supra; State v. Primes,* 275 N.C. 61, 165 S.E. 2d 225; *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190; *State v. Overman,* 269 N.C. 453, 469, 153 S.E. 2d 44; *State v. Carter,* 265 N.C. 626, 144 S.E. 2d 826. A threat of serious bodily harm which reasonably induces fear thereof constitutes the requisite force and negates consent. *State v. Henderson, supra; State v. Bryant,* 280 N.C. 551, 557, 187 S.E. 2d 111; *State v. Primes, supra; State v. Overman, supra; State v. Carter, supra.* The evidence in this record is ample to support the jury's findings that the offense charged in the indictment was committed and that the defendant was the perpetrator of it.

[4] There is no merit in the defendant's contention that he was denied due process of law by reason of the trial judge's failure to instruct the jury properly concerning criticism in the news media of another jury which, during the same week, had found another defendant not guilty of rape. See, *State v. McVay* and *State v. Simmons,* 279 N.C. 428, 432, 183 S.E. 2d 652. The record does not indicate the nature of any such comment by the news media. We may not properly grant a new trial upon the defendant's mere assertion in his brief that, during the progress of his trial, some statement, vaguely described as critical, was made by some undesignated radio commentator concerning the acquittal of another defendant in another case by another jury. All that appears in the present record relative to this contention is that, following the argument of counsel to the jury and

State v. Burns

immediately preceding the charge of the court to the jury, the court addressed the jury as follows:

"THE COURT: Members of the jury, counsel has brought to my attention the fact that something has been said on the radio today with regard to another case that was tried here this week. I was not aware of that, but of course, I instructed you not to listen to anything or discuss this case with anyone. Did any of you hear a radio report this morning about this case?

"JURY IN UNISON: No.

"THE COURT: Thank you."

The record does not disclose any request by the defendant for further instruction to the jury upon this point or any motion by the defendant with reference thereto. Nothing in the record indicates that any juror heard the statement of which the defendant complains.

The defendant contends that he was "denied due process of law in that the State knowingly used false testimony of Officer, Lt. Jerry Reed, in questioning him on a lineup when the Court had already found as a fact that there was no lineup?" He also contends that the trial court erred in its charge to the jury "in referring to the testimony of Lt. Jerry Reed concerning a lineup after the Court had already found as a fact that there was no lineup." Suffice it to say, with reference to these two assignments of error, that the word "lineup" does not appear in the narration of the testimony of Detective Lieutenant Reed in the record, except in the cross-examination of this witness by the defendant and does not appear in the summary of the testimony of this witness contained in the charge of the court. The record further sets forth no question addressed by the prosecuting attorney to this witness and no objection to or motion to strike any portion of his testimony. It shows no effort by the defendant to call to the attention of the trial judge any alleged error in the judge's summary of the evidence in his charge to the jury. Minor discrepancies in such summary are deemed waived if not called to the judge's attention in time to afford him an opportunity to correct them. *State v. Fowler*, 285 N.C. 90, 97, 203 S.E. 2d 803. These assignments of error have no merit.

[5]　The defendant's contentions that the imposition of the sentence of death upon him is a violation of his rights under the Eighth and Fourteenth Amendments to the Constitution of the United States have been considered and answered by this Court in detail in numerous recent decisions. No purpose would be served by further discussion of them. See: *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721, and *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19.

The remaining assignments of error made by the defendant are purely formal and require no discussion. There is no merit therein.

No error.

Chief Justice SHARP dissents as to the death sentence and votes to remand for the imposition of a sentence of life imprisonment for the reasons stated in the dissenting opinion of Chief Justice Bobbitt (in which she and Justice Higgins concurred) in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422 at 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975).