STATE OF NORTH CAROLINA v. CARDELL SPAULDING, JOE LEE
COBB AND VERNON RICHARD WALTERS

No. 4

(Filed 5 November 1975)

1. Criminal Law § 92— consolidation of indictments for trial

The trial judge may, in his discretion, order the consolidation for trial of two or more indictments in which defendants are charged with crimes of the same class when the crimes are so connected in time or place that evidence at trial of one of the indictments will be competent and admissible at the trial of the others. G.S. 15-152.

2. Criminal Law § 48— implied admissions

Implied admissions are received with great caution; however, if the statement is made in a person's presence by a person having first-hand knowledge under such circumstances that a denial would be naturally expected if the statement were untrue and it is shown that he was in a position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission.

3. Constitutional Law § 31; Criminal Law §§ 48, 79— statement made in defendant's presence — failure of defendant to deny — no implied admission

Where a statement of one defendant implicating a codefendant was made in the presence of the codefendant, but there was no evidence that the codefendant was in a position to hear or understand the statement and make a denial, admission of the evidence as an implied admission violated the codefendant's right of confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments to the U. S. Constitution; however, such evidence was harmless beyond a reasonable doubt where there was plenary competent evidence that the codefendant committed the crime in question.

4. Homicide § 21— first degree murder of prison inmate — sufficiency of evidence

Evidence was sufficient to be submitted to the jury in a prosecution for first degree murder where such evidence tended to show that the body of a prison inmate was found in the prison library, the victim had been stabbed many times, two of the defendants were observed by another inmate beating a guy in the library, two inmates observed that defendants' clothes were bloody, trousers and a knife belonging to one defendant were found in a prison trash can along with other items of clothing, two knives and two name tags, a prison maintenance supervisor found a pair of cut-up pants and a tag bearing the name of one of the defendants in a prison sewer line, and a prison inmate testified as to certain incriminating statements made by the various defendants to him or overheard by him.

5. Homicide § 15— bloody scene of crime — testimony properly admitted

The trial court in a first degree murder prosecution did not err in allowing a witness to describe the blood he observed on the floor

State v. Spaulding

where the deceased was found, since similar testimony had not previously been elicited and since the evidence was clearly relevant and material, particularly in light of other evidence placing the blood covered defendants near the scene of the killing.

6. **Criminal Law § 78; Homicide § 18— cause of death — willingness to make stipulation — expert testimony admissible**

The trial court in a first degree murder prosecution did not err in allowing the testimony of two physicians as to the cause of decedent's death, though all defendants were willing to stipulate that the victim's death was caused by multiple stab wounds, since a stipulation as to cause of death may not be used to prevent the State from proving all essential elements of its theory of the case, and since the expert testimony had relevance beyond the facts to which defendants were willing to stipulate in that the evidence was competent to show the use of different instruments, thereby supporting an inference that the wounds were inflicted by two or more persons, and was competent to prove premeditation and deliberation.

7. **Homicide § 20— first degree murder — admissibility of photographs**

The trial court in a first degree murder prosecution did not err in admitting photographs illustrating the expert testimony of two physicians as to the cause of the victim's death.

8. **Criminal Law § 71— shorthand statement of fact — admissibility**

The Supreme Court has long held that a witness may state the instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time; such statements are usually referred to as shorthand statements of facts.

9. **Criminal Law § 71— description of bloody defendant — admission as shorthand statement of fact**

Under the "shorthand statement of facts" exception to the opinion evidence rule, the trial court properly allowed a witness to testify that on the day of the crime the witness observed one defendant and "he was bloody like he had been to a slaughter."

10. **Criminal Law § 162— failure to object to question — objection to answer too late**

Defendants could not object to testimony elicited from a witness where defendants failed to object until the witness's answer had been received even though grounds for the objection were obvious after the question had been asked.

11. **Criminal Law § 88— cross-examination of witness**

Defendants were not prejudiced by a witness's original reluctance to answer questions on cross-examination, since the witness subsequently did freely respond to questions and since defense counsel did not attempt to "sift" the witness.

State v. Spaulding

12. **Criminal Law § 96— withdrawal of evidence — repetition of evidence by court — no error**

In granting defendants' motion to strike testimony that shortly after the murder in question one defendant "looked like he had been to a hog killing," the trial court did not err in repeating the statement in the exact words of the witness, since it was necessary to repeat the language objected to so that the jury would clearly understand the portion of the evidence which it should not consider in reaching its verdict.

13. **Criminal Law § 87; Witnesses § 1— list of State's witnesses — testimony by witnesses not listed**

It is within the discretion of the trial judge to decide whether a witness shall testify when his name does not appear on a list of witnesses which the State elects to furnish defense counsel prior to trial, and defendants were not prejudiced in this case where the court allowed three witnesses whose names did not appear on the witness list to testify concerning discovery of and chain of custody as to certain exhibits which defendants must have anticipated would be offered into evidence.

14. **Criminal Law § 88— prior conduct — cross-examination proper**

The trial court did not err in allowing the solicitor to cross-examine a convicted felon concerning his prior misconduct.

15. **Criminal Law § 99— armed prison guards at trial — conduct of trial discretionary matter**

The trial judge in a first degree murder trial did not abuse his discretion by ordering or permitting strong security measures, including the presence of armed prison guards and armed officers in and around the courthouse and in the presence of the jury, since among the witnesses appearing in the case were three men convicted of murder, two men convicted of felonious breaking or entering, one man convicted of felonious larceny, five men convicted of armed robbery, and one man convicted of assault with intent to commit rape, and since the three defendants were inmates of Caledonia Prison Farm.

16. **Constitutional Law § 36; Homicide § 31— first degree murder — death penalty proper**

Imposition of the death penalty upon conviction for first degree murder was not cruel and unusual punishment.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

APPEAL by defendants from *Rouse, J.,* 11 November 1974 Special Criminal Session of HALIFAX Superior Court. Defendants gave notice of appeal in open court. Each defendant, by petition for writ of certiorari, sought additional time for the perfection of his appeal. We allowed defendants' petition on 10 February 1975.

Defendants Cardell Spaulding (Spaulding), Joe Lee Cobb (Cobb) and Vernon Richard Walters (Walters) were charged in separate bills of indictment with the first-degree murder of James Thomas Griffiths on the 18th day of March 1974. Walters was also referred to in the record as "Buckwheat" and "Walter Vernon." The charges were consolidated for trial upon motion of the State and over the objection of each defendant. After being duly arraigned, each defendant entered a plea of not guilty.

The State's evidence tended to show that on the 18th day of March at about 6:40 p.m., a custodial officer at Caledonia Prison Farm discovered the body of James Thomas Griffiths lying in a pool of blood in the prison library. The officer observed numerous stabs and cuts upon Griffiths' body. Griffiths was carried to the Scotland Neck Community Hospital where Dr. G. V. Byrum conducted an examination. Dr. Byrum testified that his examination disclosed that Griffiths died as a result of multiple stab wounds in the chest and abdomen. He found more than forty different wounds on the body. Dr. Joseph H. Harmon, a pathologist who conducted a post-mortem examination, confirmed Dr. Byrum's conclusion as to the cause of death.

The State relied heavily upon the testimony of Sharif Sarakby and Haywood Lindsay who were prisoners at Caledonia Prison Farm on 18 March 1974.

Sarakby testified that on 18 March 1974 he was in the Prison Farm dormitory when Walters left the dormitory armed with a knife avowing that he was going to "get" Thomas Griffiths because, according to Walters, he had told a prison guard that "they" were connected with a prison robbery. Cobb, also armed with a knife, shortly thereafter left the dormitory after indicating he was going to join Walters. The witness later saw Cobb and Walters and they were both covered with blood. He helped Walters remove and dispose of identifying patches from his bloody clothes. While he was performing this task, defendant Spaulding entered the room. His clothes were "messed up," but the witness did not observe any blood on Spaulding's clothes.

Haywood Lindsay, in essense, testified that shortly after supper he saw Walters and Cobb in the prison library. They were "bent over beating on a guy . . . . " The witness left the

vicinity of the library and a short time thereafter he saw defendant Spaulding who "had blood all over him." He related that Spaulding pushed him over as he went by and that Spaulding was followed by Walters, Cobb and Sarakby in that order. Cobb and Walters were bloody. Walters tried to stab him with a shank (a homemade knife), but made no further efforts after Sarakby pleaded for no further violence.

George Marshall testified that on 18 March 1974, at about 10:30 p.m., he found State's Exhibit 10, identified as trousers belonging to Walters and State's Exhibit 5, a knife identified as belonging to Walters, in a trash can in the hallway near the canteen. He also found other items of clothing, two knives and two name tags and "to the best of his knowledge" one of the name tags bore the name Sarakby. All of these items were given to SBI Agent McMahan.

Ervin Eugene Warrick, a maintenance supervisor at Caledonia Prison during the year 1974, testified that on the 18th, 19th or 20th of March he found a pair of cut-up pants and a name tag bearing the name Spaulding in the sewer line. These items were delivered to SBI Agent McMahan.

The State offered the testimony of FBI Agent McMahan for the purpose of corroborating the testimony of Sarakby and Lindsay and for the purpose of showing chain of custody of certain exhibits.

There was further evidence that Griffiths' blood type was O and that Walters' knife, State's Exhibit 5, had blood on it but there was not a sufficient amount to identify the type. Examination of Vernon Walters' identification patch revealed Type O blood. Tests performed on Walters' pants, shirt and shoes, State's Exhibits 11, 13, and 12, established the presence of Type O blood. Examination of Exhibits 14 and 15, Cobb's shoes and shirt, also disclosed Type O blood.

None of the defendants testified but offered evidence tending to show that each of them was either on the basketball court or in Cell Block 2-A playing poker in the presence of other inmates. Cobb also presented evidence to show that a cut on his left index finger was a result of an accident which occurred in the laundry room on the day of the killing. Walters offered evidence to show that a cut found on his leg occurred while he was working with a shovel on the prison farm.

The jury returned verdicts of guilty as charged in the indictments as to each defendant. Defendants appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Lester V. Chalmers, Jr., for the State.*

*W. Lunsford Crew for defendant appellant Spaulding.*

*William F. Dickens, Jr. for defendant appellant Cobb.*

*H. P. McCoy, Jr. for defendant appellant Walters.*

BRANCH, Justice.

Defendants assign as error the ruling of the trial judge allowing the cases to be consolidated for trial. Each defendant contends that his constitutional right of confrontation and cross-examination as guaranteed by the Sixth Amendment to the United States Constitution was violated by the reception of evidence of admissions by one of his codefendants which implicated him in the crime charged which evidence was inadmissible against him.

[1] The trial judge may, in his discretion, order the consolidation for trial of two or more indictments in which the defendants are charged with crimes of the same class when the crimes are so connected in time or place that evidence at trial of one of the indictments will be competent and admissible at the trial of the others. G.S. 15-152; *State v. Parker,* 271 N.C. 414, 156 S.E. 2d 677; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506, cert. denied, 384 U.S. 1020; *State v. Morrow,* 262 N.C. 592, 138 S.E. 2d 245; *State v. White,* 256 N.C. 244, 123 S.E. 2d 483. We are advertent to the repeal of G.S. 15-152, effective 1 July 1975. The repealing act is applicable to all criminal proceedings begun on or after that date. N. C. Sess. Laws ch. 1286 (1973). This trial was held before the effective date of this repealing legislation.

Prior to the decision in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620, the general rule was that the admission of extrajudicial confessions of one codefendant, even though it implicated another against whom it was inadmissible, was proper when the trial judge instructed the jury that the evidence was admitted only against the defendant making the confession and must not be considered by the jury in any manner in determining the charge against his codefend-

ant(s). *State v. Lynch,* 266 N.C. 584, 146 S.E. 2d 677; *State v. Taborn,* 268 N.C. 445, 150 S.E. 2d 779; *State v. Arnold,* 258 N.C. 563, 129 S.E. 2d 229, rev'd on other grounds, 376 U.S. 773, 12 L.Ed. 2d 77, 84 S.Ct. 1032. The decision in *Bruton* complicated joint trials. The essence of the holding in *Bruton* is that the admission of a confession implicating a codefendant violates the non-confessing defendant's Sixth Amendment rights of confrontation and cross-examination unless the confessor takes the stand so as to be subjected to cross-examination.

The landmark North Carolina case interpreting *Bruton* is *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492. There Justice Sharp (now Chief Justice) speaking for the Court stated:

> . . . [I]n joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant (see *State v. Bryant, supra),* and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation. See *State v. Kerley, supra* at 160, 97 S.E. 2d at 879.

Accord: *State v. Parrish,* 275 N.C. 69, 165 S.E. 2d 230; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481; *State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39. We note parenthetically that the majority of our cases interpreting the *Bruton* rule refer to in-custody *confessions;* however, the rule as stated in *Bruton* and *Fox* applies with equal force to *admissions* by a defendant which implicate another against whom the evidence is inadmissible. *State v. Jones,* 280 N.C. 322, 185 S.E. 2d 858; *Bruton v. U.S., supra;* 2 Stansbury's N. C. Evidence, § 182, pp. 62-63 (Brandis Rev. 1973).

Obviously some of the statements challenged by defendants offend the *Bruton* rule and constitute prejudicial error unless the statements are competent against the nondeclarants or unless the total evidence is so overwhelming that the erroneous admission is harmless beyond a reasonable doubt. *State v. Davis* and *State v. Fish,* 284 N.C. 701, 202 S.E. 2d 770.

In order to avoid repetition as we consider each respective defendant's contentions under this assignment of error, we summarize the portions of the record containing admitted evidence which defendants contend violated their constitutional rights of confrontation and cross-examination:

Subsection A: In the early portion of the testimony of the witness Sarakby, he related that in the presence of James Cobb and the witness that defendant Walters said, "We are going to get him, that so and so. We are going to get that Son of a Bitch." Whereupon Walters put a knife in his pants and left. Cobb then put a knife in his shirt and said, "I won't let him go alone. Stay there. Don't go anywhere." Only Cobb and Walters were present when these statements were made to Sarakby.

Subsection B: The solicitor inquired whether Walters or Cobb had told the witness why they were going to get James Griffiths. The witness responded that Walters had told him that James Griffiths had "told the man about the robbery they had on the week before." The record does not disclose whether anyone was present other than the witness and Walters on this occasion.

Subsection C: Walters stated to Sarakby "I want you to do me a favor and to do Joe Cobb a favor . . . we don't want you talking to no blacks whatsoever." The record does not show that anyone was present at this time except the witness and Walters; however, shortly thereafter the same admonition was repeated by Walters in the presence of Cobb who did not comment.

Subsection D: The witness Sarakby testified that Cobb, covered with blood, walked quickly back to the dormitory and at that time the witness asked Cobb what happened. Cobb replied, "We got him, he is dead, we killed him." The witness inquired "Where was it?" and Cobb replied "In the library." At the same time, Cobb asked the witness Sarakby to go help Walters. No one was present at this time except Cobb and the witness.

Subsection E: The witness Sarakby further testified:

After headcount Buckwheat [Walters], Joe Lee Cobb, Cardell Spaulding and me went to the game room and sat at the same table. There were more guys with us. Billy Spaulding told Joe Cobb, "Joe, we got him, he is dead, we

State v. Spaulding

have killed him, so we ain't got to worry about his talking, ain't nobody going to talk."

Q. All right, go ahead.

A. At this time, I turned around and asked Walter Vernon [Walters], who was sitting to my right, if Billy Spaulding had anything to do with the murder. He said, "Yes, he had, just don't say anything about it, you know, we are not supposed to tell anybody about it."

Q. What else did he say?

A. He just said that Billy Spaulding—Billy Spaulding was sitting on my left and he was talking to some other guys sitting at the table over there. He said, "Keep your mouth shut, you ain't seen nothing and you ain't heard nothing. We got him, we killed him, and he is gone, so we ain't going to worry about him no more." That is what he said.

Subsection F: The witness Lindsay, after testifying that he saw Walters and Cobb beating on a man in the library, said that shortly thereafter he observed Walters and Cobb and Spaulding, followed by Sarakby, coming from the direction of the library. He stated that Spaulding, Cobb and Walters were bloody and as they passed by, Walters said, "We just killed a Goddamned man in the library." At that time, all three defendants were together and Cobb and Spaulding remained silent.

We first consider whether the admission into evidence of these various statements and admissions of other codefendants violated defendant Spaulding's constitutional right of confrontation and cross-examination. When read contextually the statements summarized in Subsections A through D do not in any way implicate Spaulding. The "we's" and "they's" seem to refer only to Cobb and Walters. Spaulding is never mentioned by name. See State v. Jones, 280 N.C. 322, 185 S.E. 2d 858. However, in a later portion of the testimony of the witness Sarakby the record shows that Walters made a statement implicating Spaulding while Spaulding, Cobb and Walters were sitting at a table in the game room. The circumstances under which this statement was made are fully set forth in Subsection E. The State takes the position that the Bruton rule does not apply because the evidence was admissible as an implied admission since Spaulding was present and failed to deny any complicity in the murder.

[2, 3] Implied admissions are received with great caution. However, if the statement is made in a person's presence by a person having firsthand knowledge under such circumstances that a denial would be naturally expected if the statement were untrue and it is. shown that he was in position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission. 2 Stansbury's N. C. Evidence, § 179, p. 50 (Brandis Rev. 1973). *State v. Moore,* 262 N.C. 431, 137 S.E. 2d 812; *State v. Guffey,* 261 N.C. 322, 134 S.E. 619; *State v. Bryant,* 235 N.C. 420, 70 S.E. 2d 186; and *State v. Wilson,* 205 N.C. 376, 171 S.E. 2d 338. It is true that the statement implicating defendant Spaulding was made in his presence, but it was not shown that he was in a position to hear or understand the statement made by Walters. In fact, the State's evidence shows that at the time statement was made, Spaulding was "talking to some other guys sitting at the table over there." A denial could not be expected under these circumstances and this evidence was not admissible as an implied admission. Since the evidence was not admissible as to Spaulding, its admission clearly violated his right of confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States. There remains, nevertheless, the question of whether the erroneous admission of this evidence was harmless error beyond a reasonable doubt.

In *State v. Jones, supra,* Chief Justice Bobbitt wrote:

. . . [I]n each case the prejudicial impact of testimony of out-of-court declarations of a codefendant, even when the right to confrontation is afforded, must be evaluated in the light of the competent admitted evidence against the nondeclarant defendant referred to in such declarations. We do not foreclose the possibility that the gap between the impact of evidence which is not admitted against but incriminates the nondeclarant and of competent evidence of minimal probative value admitted against him in a given case may be so great as to constitute a denial of due process. No such gap exists in the present case.

Here the weight of the evidence erroneously admitted against Spaulding must be evaluated in light of the competent evidence admitted against him.

In essence, the competent evidence against Spaulding was as follows: The witness Sarakby stated that he heard Spaulding tell Cobb "Joe, we got him, he is dead, we have killed him, so we ain't got to worry about him talking, ain't nobody going to talk." The witness Lindsay saw Spaulding in the hallway shortly after he saw Cobb and Walters beating a man in the library and at that time Spaulding had blood all over him. Cobb and Walters were behind Spaulding and both of them were covered with blood. The witness Lindsay heard Walters, in the presence of Spaulding, state "We just killed a Goddamned man in the library." Spaulding made no denial or explanation as to this statement. Thereafter Spaulding's name tag was found with some cut-up trousers in a sewer line.

When we evaluate the probative value of the competent evidence admitted against Spaulding as compared to the admissions of other codefendants admitted into evidence which were not competent against him, we conclude that the evidence which violated Spaulding's Sixth Amendment rights of confrontation and cross-examination was rendered harmless beyond a reasonable doubt. *Brown v. United States,* 411 U.S. 223, 36 L.Ed. 2d 208, 93 S.Ct. 1565; *Schneble v. Florida,* 405 U.S. 427, 31 L.Ed. 2d 340, 92 S.Ct. 1056: *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824.

We next consider whether there was prejudicial error as to defendant Walters in the admission of the statements challenged by this assignment of error.

The record discloses that defendant Walters was present under such circumstances that a denial would be naturally expected if the statement made was untrue when the statements summarized in Subsections A, B, C and E were made. Thus his silence under the circumstances shown by the record amounted to implied admissions and this evidence was competent as to him. Walters was not present when Cobb made the admission set out in Subsection D to the effect that "We got him . . . . We killed him. He's dead." Neither was he present when Cobb told Sarakby "to go help Walter Vernon." These admissions were received in violation of Walters' constitutional rights of confrontation and cross-examination. However, the State presented competent evidence tending to show that: (1) Walters was seen beating a man in the library shortly before Giffiths' bloody body was discovered, (2) he was seen covered with blood near the scene of the killing and at that time declared

"We have just killed a Goddamned man in the library." (3) shortly before the body of Griffiths was discovered Walters declared he "was going to get that S.O.B."

The mass of evidence against defendant Walters was so great that any incrimination by the statements of his codefendants was rendered harmless beyond a reasonable doubt.

Finally, we consider the admission of the challenged statements as to defendant Cobb. The only statements which tend to violate Cobb's constitutional rights to confrontation and cross-examination are contained in Subsections B and C. In connection with the statements made in Subsection B, the record indicates only that *Walters* was mad with Griffiths because he had told the man about the robbery they had on the week before. Cobb was not named as one participating in the robbery or as having a grudge against Griffiths. Nowhere in the record was there anything which connects this statement with Cobb. We do not think that Cobb was incriminated by the statements contained in Subsection B. The remaining statement which might have violated the *Bruton* rule as to Cobb, at most, implied that Cobb and Walters had *some* criminal plans. Even if we concede, which we do not, that these statements did implicate Cobb, the overwhelming evidence against him convinces us that the admission of such evidence was harmless error beyond a reasonable doubt. Competent evidence against Cobb tends to show the following: Cobb was identified by an eyewitness as one of the men he saw beating on a man in the library a short time before Griffiths' bloody body was discovered. Cobb, armed with a knife, stated that he was going to join Walters immediately after Walters left his presence after saying, "We are going to get that S.O.B." Cobb was seen near the library covered with blood a short time before the discovery of Griffiths' body. While washing blood from his person, he told Sarakby "We got him, he is dead. We killed him." He also directed Sarakby to go and help the bloody Walters.

For the reasons stated, we hold that the trial judge did not err when he allowed the State's motion to consolidate the cases for trial.

[4]  Each defendant contends that the trial judge erred in overruling his motions for judgment as of nonsuit at the conclusion of the State's evidence and at the conclusion of all of the evidence.

The rules governing consideration of the evidence upon a motion for judgment as of nonsuit and the sufficiency of the evidence to withstand such motion are clearly stated by Justice Lake in the case of *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755, as follows:

> Upon the defendant's motion for judgment of nonsuit in a criminal action, the question for the court is whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense. If so, the motion is properly denied. In making this determination, the evidence must be considered in the light most favorable to the State and the State is entitled to the benefit of every reasonable inference to be drawn from it. Contradictions and discrepancies in the testimony of the State's witnesses are to be resolved by the jury and, for the purpose of this motion, they are to be deemed by the court as if resolved in favor of the State. In determining such motion, incompetent evidence which has been admitted must be considered as if it were competent. [Citations omitted.]

> The test of the sufficiency of the evidence to withstand the motion for judgment of nonsuit is the same whether the evidence is circumstantial, direct, or both. There is substantial evidence of each element of the offense charged, or of a lesser offense included therein, and of the identity of the defendant as the perpetrator of it if, but only if, interpreting the evidence in accordance with the foregoing rule, the jury could draw a reasonable inference of each such fact from the evidence. If, on the other hand, the evidence so considered, together with all reasonable inferences to be drawn therefrom, raises no more than a suspicion or a conjecture, either that the offense charged in the indictment, or a lesser offense included therein, has been committed or that the defendant committed it, the evidence is not sufficient and the motion for judgment of nonsuit should be allowed. [Citations omitted.]

In view of the detailed recitation of the evidence as to each defendant in our consideration of the preceding assignment of error we do not deem it necessary to again review the State's evidence. Suffice it to say that upon applying the above-stated

rules we conclude that there was ample evidence to carry the case to the jury as to each defendant.

[5] Defendants next contend that the court erred in allowing William Bryant to describe the blood he observed on the floor where the deceased was found. Objection to the question eliciting William Bryant's description of the blood surrounding the decedent's body was lodged on the ground that the testimony would be repetitious. Our examination of the record does not reveal any occasion on which similar testimony had been elicited. This evidence was clearly relevant and material, particularly in light of other evidence placing the blood covered defendants near the scene of the killing. This evidence was properly admitted. See *State v. Cumber*, 280 N.C. 127, 185 S.E. 2d 141.

[6] Defendants argue that the trial judge erred in allowing the testimony of two physicians as to the cause of decedent's death when all defendants were willing to stipulate that Griffiths' death was caused by multiple stab wounds. Although there is authority for the proposition that evidence of an admitted fact may be properly excluded, a stipulation as to the cause of death may not be used to prevent the State from proving all essential elements of its theory of the case. *State v. Cutshall*, 278 N.C. 334, 347, 180 S.E. 2d 745. The expert testimony had relevance beyond the facts to which defendants were willing to stipulate in that the evidence was competent to show the use of different instruments, thereby supporting an inference that the wounds were inflicted by two or more persons.

The use of grossly excessive force or the delivering of lethal blows after a deceased has been felled are among the circumstances to be considered in determining whether a killing is done with premeditation and deliberation. Therefore, this evidence was also admissible for the purpose of proving premeditation and deliberation.

[7] The photographs illustrating these experts' testimony were also properly admitted over defendants' objections. It has long been the rule in this State that "[r]elevant evidence will not be excluded simply because it may tend to prejudice the opponent or excite sympathy for the cause of the party who offers it." 1 Stansbury, supra at § 80, p. 242. In *State v. Cutshall, supra,* this Court stated:

Properly authenticated photographs of the body of a homicide victim may be introduced into evidence under

instructions limiting their use to the purpose of illustrating the witness' testimony. Photographs are usually competent to be used by a witness to explain or illustrate anything that is competent for him to describe in words. The fact that the photograph may be gory, gruesome, revolting or horrible, does not prevent its use by a witness to illustrate his testimony. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824.

This assignment of error is overruled.

[8, 9]  On direct examination Sarakby testified that he observed defendant Cobb on 18 March 1974, and "he was bloody like he had been to a slaughter." Defendants contend that Cobb's objection should have been sustained and his motion to strike should have been allowed since the witness was giving his opinion of the defendant's appearance. This Court has long held that a witness may state the "instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." Such statements are usually referred to as shorthand statements of facts. *State v. Skeen,* 182 N.C. 844, 109 S.E. 71.

In *State v. Sterling,* 200 N.C. 18, 156 S.E. 96, it was held to be proper to allow a witness to state that the defendant's face "appeared to be the face of a man who had taken a hasty shave with a dull razor in cold water." In *Skeen, supra,* this Court held that it was proper to allow testimony that the defendant's shoes were muddy and "[d]idn't look like they had been unlaced in several days."

In our opinion, Sarakby's description of defendant Cobb was a permissible expression of opinion under the "shorthand statement of facts" exception to the opinion evidence rule.

[10]  Defendants also contend that the rule prohibiting expressions of opinion by lay witnesses was violated when Sarakby was permitted to testify that Walters and Spaulding were referring to Griffiths when they made statements that they had killed "him." Defendants did not object to the district attorney's question until after the witness had responded. This assignment of error is deemed waived since defendants did not object

until after the answer had been received even though grounds for the objection were obvious after the question had been asked.

> . . . [I]t is well settled that an objection must be interposed to an improper question without waiting for the answer and, if the objection is not made in apt time, a motion to strike a responsive answer is addressed to the discretion of the trial court except where the evidence is rendered incompetent by statute. [Citations omitted.]

*State v. Perry*, 275 N.C. 565, 169 S.E. 2d 839. Even had the evidence been improperly admitted, it is evident that the witness must have referred to Griffiths since there is nothing in this record to indicate other murders in which these parties were involved. We cannot perceive how the jury could have been misled or defendant prejudiced by the admission of this evidence.

[11]  Upon his cross-examination, the State's witness Sarakby at first refused to answer several questions. Defendants contend that they were thereby denied their right to a full and fair cross-examination. They rely on the case of *Bank v. Motor Co.*, 216 N.C. 432, 5 S.E. 2d 318. A cursory examination of the case cited by defendants in support of their contentions reveals significant distinguishing features. In *Bank*, one of the chief witnesses answered several immaterial questions, and then refused to answer any further questions. Conversely, in the present case Sarakby initially refused to answer several questions, but after some hesitation did freely respond to questions. Certainly defendants were not prejudiced by this witness's original reluctance to answer questions on cross-examination. The insignificance of these matters is highlighted by the failure of defense counsel to attempt to "sift" the witness. This assignment of error is overruled.

[12]  On direct examination, Haywood Lindsay testified that he saw defendant Walters in the vicinity of the library and Walters "looked like he had been to a hog killing." Following a motion to strike this testimony, the trial judge granted the motion to strike and instructed the jury to disregard the statement "looked like he had been to a hog killing." Defendants contend that the trial judge erred by repeating the statement in the exact words of the witness. When a motion to strike is granted, the trial judge should instruct the jury to disregard

the stricken evidence. It is presumed that the jury will follow such instructions. *State v. Self*, 280 N.C. 665, 187 S.E. 2d 93; *State v. Moore*, 276 N.C. 142, 171 S.E. 2d 453; *State v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334; *Wilson v. Mfg. Co.*, 120 N.C. 94, 26 S.E. 629. Here the trial judge properly instructed the jury to disregard the objectionable testimony. It was necessary for him to repeat the language objected to so that the jury would clearly understand the portion of the evidence which it should not consider in reaching its verdict. We find no merit in this assignment of error.

[13]    All defendants contend that the trial court erred in allowing the State to present witnesses whose names had not been furnished to defense counsel prior to jury selection. In this assignment of error, defendants argue that the State's failure to furnish a complete list of the State's witnesses denied them their "inherent right" to examine jurors on *voir dire* as to their relationship to the State's witnesses. Pursuant to defendants' request, the district attorney did give defendants a list of witnesses that the State intended to present, but this list did not include the names of three witnesses, James Goddard, James Walker and Roy Harrison. In *State v. Hoffman*, 281 N.C. 727, 734, 190 S.E. 2d 842, Justice Sharp (now Chief Justice) stated for the Court:

> "The common law recognized no right of discovery in criminal cases." *State v. Goldberg*, 261 N.C. 181, 191, 134 S.E. 2d 334, 340 (1964). *In the absence of a statute requiring the State to furnish it, the defendant in a criminal case is not entitled to a list of the State's witnesses who are to testify against him. McDaniel v. State*, 191 Miss. 854, 4 So. 2d 355 (1941); *Padgett v. State*, 64 Fla. 389, 59 So. 946 (1912); *State v. Matejousky*, 22 S.D. 30, 115 N.W. 96 (1908); 21 Am. Jur. 2d *Criminal Law* § 328 (1965); 16 C.J.S. *Criminal Law* § 2030 (1938). There is no such statute in this State. [Emphasis ours.]

See also *State v. Lampkins*, 286 N.C. 497, 212 S.E. 2d 106.

We note that a legislative proposal which would have required the State to furnish a list of witnesses the district attorney intended to call at trial was deleted from the Criminal Procedure Act when it was adopted by the General Assembly. See Official Commentary following G.S. 15A-903 (1975).

It is within the discretion of the trial judge to decide whether a witness shall testify when his name does not appear on a list of witnesses which the State elects to furnish defense counsel prior to trial. The Judge's ruling will not be reversed absent a showing of abuse of discretion. *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336. Under such circumstances, we think it to be the better practice before ruling for the Court to interrogate the jurors as to their relationship with the tendered witnesses. Although this procedure was not followed here, we find no prejudice to defendants. The testimony given by these witnesses did not relate to essential elements of the crime charged, but only to the discovery of and chain of custody as to certain exhibits. Defense counsel could not have been misled or surprised by the omission of the names of the witnesses Goddard, Walker and Harrison from the list furnished by the State since they must have anticipated the offer of these exhibits into evidence. This assignment of error is overruled.

[14]  Defendants contend that the trial judge erred by overruling their objection to a question by the solicitor to the witness Pridgen.

During witness Pridgen's cross-examination, the solicitor asked him, "Listen to me and answer me carefully. If you are the man who concealed the gun in the radio that kidnapped Dr. Edwards down here at Scotland Neck. . . ." The witness answered, "No I did not." Pridgen was a prisoner serving time for conviction of a felony.

A witness may be cross-examined by asking disparaging questions concerning collateral matter relating to his criminal or degrading conduct; however, the questions must be asked by the solicitor in good faith. *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 714; *State v. Ross,* 275 N.C. 550, 169 S.E. 2d 875, cert. denied, 397 U.S. 1050; *State v. Griffin,* 201 N.C. 541, 160 S.E. 826. The limits of proper cross-examination are largely within the discretion of the trial judge, and his ruling thereon will not be held to be error in the absence of a showing that the jury verdict was improperly influenced thereby. *State v. McPherson,* 276 N.C. 482, 172 S.E. 2d 50; *State v. Stone,* 226 N.C. 97, 36 S.E. 2d 704; *State v. Beal,* 199 N.C. 278, 154 S.E. 604. Since the solicitor's question related to collateral matter the witnesses' negative answer was conclusive and rendered the question harmless. *State v. Ross, supra.* This record does not disclose bad faith on the part of the solicitor in asking the

challenged question. Even assuming, *arguendo*, that the question was asked in bad faith, we cannot conceive that a single question directed to this witness, a convicted felon, concerning his prior misconduct would have affected the jurors in reaching their verdict.

This assignment of error is overruled.

[15] Defendants each contend that the trial judge committed prejudicial error by permitting the use of armed prison guards and allowing the presence of armed officers in and around the courthouse and in the presence of the jury during the course of the trial.

It is the duty of the trial judge, in the exercise of his discretion, to regulate the conduct and the course of business during a trial. The exercise of this discretion will not be reviewed absent a showing of abuse of discretion. 75 Am. Jur. 2d TRIAL, § 30, pp. 142, 143; *State v. Kirkman*, 234 N.C. 670, 68 S.E. 2d 315; *State v. Vann*, 162 N.C. 534, 77 S.E. 295.

Among the witnesses appearing in this case were three men convicted of murder, two men convicted of felonious breaking and entering, one man convicted of felonious larceny, five men convicted of armed robbery and one man convicted of assault with intent to commit rape. The three defendants, charged with first-degree murder, were inmates of Caledonia Prison Farm. Under these circumstances, it would seem reasonable for the trial judge to take strong security precautions. Further the trial judge knew the atmosphere and emotional climate which existed in the courtroom. We do not have the benefit of this knowledge. The presence of these armed officers and guards could add little in the way of fear to the courtroom atmosphere produced by the evidence picturing a vicious crime of violence committed upon a prison background.

We hold that the trial judge did not abuse his discretion by ordering or permitting strong security measures during the course of this trial.

[16] Finally all defendants contend that the imposition of the death penalty is cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution. The constitutionality of the death sentence has been uniformly upheld in numerous recent decisions of this Court. *State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607; *State*

*v. Robbins,* 287 N.C. 483, 214 S.E. 2d 756; *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80; *State v. Wetmore,* 287 N.C. 344, 215 S.E. 2d 51; *State v. Vinson,* 287 N.C. 326, 215 S.E. 2d 60; *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742; *State v. Burns,* 287 N.C. 102, 214 S.E. 2d 56; *State v. Boyd,* 287 N.C. 131, 214 S.E. 2d 14; *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894; *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19. We adhere to the holdings in these cases.

Because of the seriousness of these cases, we have carefully examined this entire record. Our examination does not disclose such prejudicial error as would justify the granting of a new trial or that the judgments be disturbed.

No error.

Chief Justice SHARP dissenting as to the death penalty:

The murder for which defendants were convicted occurred on 18 March 1974, a date between 18 January 1973, the day of the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly re-wrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974)—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendants by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Justice Bobbitt, and my concurrence therein, in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.