State v. Ledford

---

STATE OF NORTH CAROLINA v. FATE LEDFORD, DEFENDANT

No. 7924SC63

(Filed 15 May 1979)

**1. Criminal Law § 71— freshness of blood—shorthand statement of fact**
Testimony by the sheriff that blood he observed on the ground was fresh "within one to three hours, maybe" was admissible as a shorthand statement of fact.

State v. Ledford

2. **Criminal Law § 55— blood alcohol content—failure to show chain of custody of sample**

Although the trial court erred in permitting a pathologist to testify as to the blood alcohol content of deceased when the State failed to establish the chain of custody of the blood sample taken from deceased, such error was harmless where no attempt was made to establish that alcohol played a role in the death of the deceased.

3. **Criminal Law § 77.1— statements made by defendant—witness's uncertainty as to when made—credibility**

Even if a witness's testimony conveyed an uncertainty as to whether statements made to him by defendant occurred prior to or subsequent to the shooting of deceased, such uncertainty went to the credibility and weight of the testimony and not to its admissibility.

APPEAL by defendant from *Howell, Judge.* Judgment entered 25 August 1978 in Superior Court, MADISON County. Heard in the Court of Appeals 24 April 1979.

Defendant was indicted for first degree murder, tried by a jury for second degree murder and convicted of voluntary manslaughter. From judgment imposing an active sentence of not less than 17 nor more than 20 years, defendant appeals.

Evidence for the State tended to show the following: That on 24 April 1978 the deceased, Troy Arrington, ate supper with his mother at 6:00 p.m. and left her house between 6:30 p.m. and 7:00 p.m. to take some clothes to his two daughters who live with their mother, Geneva Arrington, in Long Branch; that the deceased and Geneva had entered into a separation agreement approximately a year before; that the deceased was right handed. Dr. W. O. Duck, a family practitioner, testified that he was called to examine the body of the deceased by Sheriff Ponder at 11:45 p.m. on 24 April 1978. He observed the body lying in the yard of a dwelling house in Long Branch, lying face up with a revolver under the left hand. There was an entrance wound and exit wound in the body, and Dr. Duck smelled a moderate odor of alcohol about the body. He was unable to determine the time of death. A small amount of rigor was observable in the body "which occurs one to eight hours after death." Another witness also smelled alcohol about the body.

The deceased's older daughter testified that defendant had visited with her mother, Geneva Arrington, before her mother

and father separated. On cross-examination, she stated that she had heard her father threaten to beat defendant with his hands on numerous occasions during the past year.

Sheriff Ponder testified that at 11:04 p.m. on 24 April 1978 he was called to Geneva Arrington's house; that he arrived at 11:28 p.m. and saw the body of the deceased lying 15 feet from the porch; that the deceased was lying with his arms spread out and with a pistol containing five spent shells under his left arm; that no one was in the house; that he then drove about a half mile to the home of Kitty Blankenship (the grandmother of Geneva Arrington); that he found the defendant and Geneva there; that he then returned to cover the body since it was raining hard; that he found three spots of blood lying between the porch steps and the body; that, in his opinion, the blood was "within one to three hours, maybe" old; that when he first observed defendant, he believed that defendant's clothes were dry even though it had been raining hard; that defendant told him that he and Geneva had walked across the mountain from Raymond Ramsey's house and that when they reached Geneva's house, the deceased ran from behind a wood pile and said, "Oh yes, damn you, I've got you now"; that defendant started to run and the deceased fired four to five shots; that defendant fell and then fired his rifle once at deceased and saw the deceased fall; that he found no bullet holes, shells or alcoholic beverages at the scene.

Dr. Carl Biggers, a physician certified in anatomical and clinical pathology, testified that he examined the body on the morning of 28 April 1978. He sent a blood sample to Chapel Hill for blood alcohol determination. The blood alcohol level was negative. The stomach of the deceased contained approximately one quart of recently ingested and partially digested food material including beans and leafy green vegetables. In his opinion, if the deceased ate his last meal on 24 April 1978, consisting of potatoes, beans, cornbread and milk at approximately 6:00 p.m., then he would not expect to find a quart of food material in deceased's stomach at 10:45 p.m. on the same day. On cross-examination, Dr. Biggers stated that he could not determine the precise time of death.

Billie Jones testified that he saw a life insurance policy in the glove compartment of the deceased's truck the day before he was

killed. Evidence was then presented that deceased owned an insurance policy with an accidental death benefit of $4,000 with his widow as beneficiary. After the death of deceased, Geneva submitted a claim form for the benefits.

Ida Ramsey testified that on 24 April 1978, between 5:30 and 6:00 p.m., she saw Geneva and defendant in the mountain field above her house. Long Branch is directly across the mountain from her house. Edward Eugene Arrington testified that on 24 April 1978 at approximately 7:30 or 8:00 p.m. he saw deceased in his pickup truck turn at the fork of Long Branch Road which was where Geneva lived. George Blankenship, a neighbor of Geneva's, testified that on 24 April 1978 at about 10:15 p.m. he heard five shots in rapid succession. Raymond Ramsey, the husband of Ida Ramsey, testified that from his house there was a long way and short way to get to Long Branch. Depending on which way one traveled, the walk would take from a half hour to an hour. He also testified that defendant carried a gun just about all the time. On the afternoon of 23 April 1978, deceased and Calvin Rice visited with Ramsey. Deceased asked Ramsey to try to persuade Geneva to come back to him. When deceased and Rice left Ramsey's house, they headed in the direction of the defendant's house. Ramsey later saw the deceased's Jeep in front of the defendant's house. The next day, defendant told Ramsey that deceased and Rice had come to his house and "fired some shots." On cross-examination, Ramsey testified that on 23 April 1978 the deceased threatened to kill defendant if he found defendant with his wife. Ramsey heard the deceased make numerous similar threats during the previous year. He testified that a walk from his place to Geneva's place would take an hour to an hour and a half. In his opinion, it would be hard for a woman to make the walk in one and a half hours. On 24 April 1978, defendant told Ramsey he had run from deceased for the last time.

A deputy sheriff testified that the deceased was a good marksman. Charlie Shook testified that several weeks after defendant was released from jail on bond, he helped Shook haul hay for Raymond Ramsey. Defendant told Shook that he shot deceased in Geneva's house. Several weeks later, defendant told Shook that when the decedent ran from a wood pile and began shooting at defendant and Geneva, the defendant shot him in the

yard. Shook was not certain when defendant made either of these statements, but thought it was in April.

The defendant presented the testimony of eleven witnesses, including himself. Raymond Ramsey's daughter testified that she kept cattle at her father's place until May and was responsible for ordering and obtaining hay. The last time she bought any hay was in March. Calvin Rice testified that on 23 April 1978 he heard the deceased say that he was going to kill the defendant and Geneva if he found them together. Kitty Blankenship, Geneva's grandmother, testified that on 24 April 1978 at 8:00 p.m. the deceased came to her house to return some of his children's clothes. He left a few minutes later traveling in the opposite direction from Geneva's house. About 10:45 p.m., she heard several shots. A few minutes later, Geneva and the defendant came into her house and defendant indicated that he thought he had killed the deceased and then made a telephone call. Both Geneva and defendant were wet.

Geneva's mother, Edna Robinson, testified that she was at the home of Kitty Blankenship when deceased arrived at 8:00 p.m. on 24 April 1978. After Mrs. Robinson refused to give the deceased the keys to Geneva's house, he left driving at a high rate of speed in the opposite direction from Geneva's house. She also testified that she had recently walked from Geneva's house to defendant's house and that it took three hours. She admitted that there was a shorter route but did not know how long that route took.

Laura Parker, the defendant's aunt, testified that on 23 April 1978, the defendant telephoned her and asked her to call the sheriff to report that the deceased and Rice were at defendant's house shooting.

Geneva testified that on 24 April 1978 she and the defendant left this house at 7:00 p.m. to walk to her house. They took the long way in order to stay off the public road and rested several times along the way. As she and defendant approached the porch to her house, deceased ran from behind a wood pile and began shooting. She denied that after the shooting she poured alcohol on the deceased and searched his truck for a life insurance policy. She also denied that she had refused to allow the sheriff to investigate the inside of her house for bullet holes.

---

---

Defendant testified that when he and Geneva reached Geneva's house after 10:00 p.m. the deceased came from behind a wood pile and began shooting. The defendant began running backwards and fell and fired at deceased. Defendant and Geneva then ran to the house of Geneva's grandmother and the sheriff arrived about a half hour later. Defendant denied that he shot the deceased around 8:00 p.m. in Geneva's house, poured alcohol on his body, moved the body to the porch, fired five shots around 10:00 p.m., and then called for help.

Sheriff Ponder was recalled and testified that he was never refused admission into Geneva's house and that an automobile insurance policy was the only policy found in deceased's truck.

*Attorney General Edmisten, by Assistant Attorney General Donald W. Stephens, for the State.*

*Staunton Norris, for defendant appellant.*

CARLTON, Judge.

In his brief, defendant brings forward six arguments out of 20 assignments of error. The remaining assignments of error are deemed abandoned. Rule 28, North Carolina Rules of Appellate Procedure.

It is essential in understanding the arguments presented by defendant on appeal to note the theories of the State and the defendant at trial: The State apparently proceeded on the theory that the defendant shot the deceased at approximately 8:00 p.m. on the evening of 24 April 1978 inside the home of Geneva Arrington or upon the front porch; that defendant and Geneva Arrington thereafter waited until approximately 10:00 p.m. and placed the body of the deceased in the yard of her home, fired the pistol of deceased and then arranged his body and the pistol in a manner calculated to give the appearance that the killing had been committed in self defense. Defendant contended that he and Geneva Arrington arrived at her home by foot at approximately 10:45 p.m. on 24 April 1978 and that, upon approaching the front porch of the dwelling, they were surprised by the deceased who had been hiding behind a wood pile and that the deceased rushed toward them firing a pistol requiring defendant to fire upon the deceased in self defense. Defendant's arguments on appeal evolve primarily around testimony of witnesses tending to establish the time of death.

[1]  Defendant first contends that the trial court erred in allowing Sheriff Ponder to give opinion testimony concerning the freshness of blood he observed on the ground near the body of the deceased. After Sheriff Ponder described the blood spots he observed on the ground, the following exchange took place:

> Q. Do you have an opinion as to whether or not the blood spots you described were fresh or otherwise?
>
> MR. NORRIS: OBJECTION.
>
> THE COURT: OVERRULED. If he has an opinion.
>
> A. Yes, sir, I have the opinion that it was fresh blood that it curdled. I wouldn't say how fresh, I would say within one to three hours, maybe.

Defendant argues that the sheriff's answer could not reasonably have been expected to be reliable or trustworthy and was a "mere surmise based upon insufficient knowledge and experience."

We believe the sheriff's answer to be a mere shorthand statement of fact. Our Supreme Court has held that a witness may testify as to whether a substance he observed was blood. *State v. Jones*, 291 N.C. 681, 231 S.E. 2d 252 (1977). We do not believe it too great an extension of the rule to allow the witness to go further and state that the blood appeared fresh or otherwise. In *State v. Jones, supra*, 291 N.C. at 685, 231 S.E. 2d 254, the Supreme Court stated:

> The average layman is familiar with bloodstains; they are a part of common experience and knowledge. When a witness says he saw blood he states an opinion based on his observations, and most likely it would be exceedingly difficult for him to describe the details which lead him to conclude that the stains were blood. When he testifies they looked like blood to him he has stated his conception. "This Court has long held that a witness may state the 'instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time.' Such statements are usually referred to as shorthand statements of facts." *State*

*v. Spaulding,* 288 N.C. 397, 411, 219 S.E. 2d 178, 187 (1975). *See* 1 Stansbury, N. C. Evidence, § 125 (Brandis rev. ed. 1973).

Moreover, defendant has shown no prejudice by the admission of this testimony. The sheriff's statement that the blood was fresh "within one to three hours, maybe" is as consistent with the defendant's contentions as it is with the contentions of the State. The sheriff did not arrive on the scene until 11:28 p.m. and defendant contended the shooting took place sometime after 10:00 p.m. This assignment of error is overruled.

Defendant next contends that the trial court committed prejudicial error in allowing inconsistent testimony by Sheriff Ponder. The sheriff initially stated that the defendant was first seen by him at the Blankenship home and that he "don't recall much about him. He looked much as he does now." Immediately thereafter this exchange took place:

> Q. Was his clothing wet or dry, Sheriff Ponder?

> A. I was soaked and I don't recall his clothes. I believe they were dry, that's what I would say if I had to say anything, it was pouring the rain and I don't recall myself.

Defendant argues that this contradictory testimony was prejudicial because the time of the shooting was a critical issue of fact. We do not agree.

While this witness was obviously uncertain as to the correct answer, we do not believe that, taken contextually, his answer could have any prejudicial effect on the jury. In the first place, the witness clearly indicated that he was not certain whether the defendant's clothes were wet or dry when he observed him. His uncertainty was apparent to the jury and surely affected the probative value of the testimony. In essence, the witness impeached his own testimony. We note also that defendant elected not to challenge the sheriff's testimony in this respect on cross-examination.

[2] Defendant next contends that the trial court erred in permitting the State's witness, Dr. Biggers, to testify as to the blood alcohol content of the deceased. He argues that there was no evidence to establish the chain of custody ·of the blood sample

from the pathologist in Asheville to the medical examiner in Chapel Hill and no evidence as to how the sample was sent to Chapel Hill. In its brief, the State concedes that, under the requirements stated by this Court in *Wood v. Brown*, 20 N.C. App. 307, 201 S.E. 2d 225 (1973), the district attorney failed to establish a proper foundation for tracing an identification of the blood specimen. State argues, however, that admission of this evidence was not prejudicial to the defendant and we agree.

Not every erroneous ruling on the admissibility of evidence will result in a new trial being ordered. 1 Stansbury, N.C. Evidence, § 9, p. 20 (Brandis rev. ed. 1973). "[T]he burden is on the appellant not only to show error but to enable the court to see that he was prejudiced or the vedict of the jury probably influenced thereby." *Collins v. Lamb*, 215 N.C. 719, 720, 2 S.E. 2d 863, 864 (1939). In the present case, defendant has failed to show any possible prejudicial error resulting from the admission of this testimony. Two witnesses had testified that they smelled a moderate odor of alcohol about the body of the deceased. However, the record discloses no issue being made over the matter of consumption of alcohol by the deceased. There was other testimony that no alcohol was found in the area. The record is barren of any theory in which the consumption of alcohol by the deceased contributed to his death nor is there any indication of any attempt made to establish that alcohol played a role in the death of the deceased. Contextually, this testimony appears to be, at most, irrelevant and harmless.

Defendant also contends that the trial court erred in permitting the State to propound certain questions on cross-examination of the defendant and his witness, Geneva Arrington, which insinuated supposed facts for which there was no evidence at the trial. Defendant cites the rule of law which forbids the prosecuting attorney to inject into the trial of a cause to the prejudice of the accused by argument or insinuating questions supposed facts of which there is no evidence. *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954).

We have carefully reviewed each of the questions by the State cited under this assignment of error. Suffice it to say that, with respect to each question, the record discloses at least some evidence to provide a factual basis for the questions asked on

cross-examination. We do not believe the trial court allowed the State to exceed reasonable bounds on cross-examination; nor did it abuse its broad discretionary authority over questions propounded on cross-examination. *See* 1 Stansbury, N.C. Evidence, § 38, p. 113 (Brandis rev. ed. 1973); *State v. Dickerson*, 189 N.C. 327, 127 S.E. 256 (1925).

[3]   Defendant's final contention is that the trial court committed prejudicial error in permitting the State's witness, Charlie Shook, to testify as to statements made by the defendant without first determining whether the statements were made before or after the shooting. We do not agree.

The substance of Shook's testimony was that the defendant gave Shook two conflicting accounts of how the shooting occurred. Defendant first told Shook that he shot the decedent inside Geneva Arrington's home. He later told Shook that he shot the decedent in Geneva Arrington's yard. Defendant argues that the witness appeared unsure as to *when* the statements were made and that the timing of the statements is critical as the distinction between a threat or statement of intention made prior to an incident and the admission of an accused made after the commission of an alleged crime is a dramatic one.

The witness's testimony on direct examination indicates that the statements were made after the shooting. The witness testified as to the time of his conversations with the defendant saying, "I believe it was after he had been released from jail on bond. I would say it was weeks afterwards." On crossexamination, the witness testified that he believed the conversation occurred in April, which could have placed the conversation either before or after the shooting, as the incident occurred on 24 April.

While the witness's cross-examination testimony could conceivably be susceptible to two differing interpretations, we do not feel that it is contradictory when considered in conjunction with the witness's testimony on direct examination. Moreover, even if the witness's total testimony did convey an uncertainty as to whether the conversations occurred prior or subsequent to the shooting, such uncertainty goes to the credibility and weight of the testimony. It is well established that the credibility, probative force, and weight of testimony are matters for the jury to decide.

---

---

1 Stansbury, N.C. Evidence, § 8, p. 17 (Brandis rev. ed. 1973); *State v. McLean*, 17 N.C. App. 629, 195 S.E. 2d 336 (1973).

We have reviewed the defendant's remaining assignments of error and are impelled to conclude that they are without merit. The defendant received a fair trial, free from prejudicial error. In the trial below, we find

No error.

Judges VAUGHN and CLARK concur.